VERGES ET AL. *v.* PIETRI ET AL.

APPEAL from the District Court of San Juan.

No. 5.—Decided June 17, 1905.

ACTION FOR RECOVERY OF PROPERTY.—To successfully prosecute an action for
recovery of property, the plaintiff must state precisely and clearly the thing

sought to be recovered, and fully prove not only his ownership of the same, but also the identity thereof.

ID.—TITLE.—The title which serves as a basis for an action for the recovery of property must be a true title to the thing sought to be recovered.

JUDGMENTS—EFFECT UPON PERSONS NOT PARTIES TO THE ACTION.—Judgments and orders rendered in a proceeding do not bind persons who have not been made parties to the action.

EVIDENCE—WEIGHT OF SAME—FINDINGS OF FACT.—In cases where inferior courts agree as to the facts established on the trial, the appellate court must accept their findings, unless, in weighing the evidence, they shall have committed manifest errors.

The facts are stated in the opinion.

*Mr. Manuel F. Rossy* for appellant.

*Mr. Cuevillas* for respondent.

*Mr. Cuevillas,* for respondent.

MR. JUSTICE WOLF delivered the opinion of the court.

This is a declaratory action brought in the former Court of First Instance of San Germán, and then in the former *audiencia territorial* of this Island, by Maria Vergés y Remond and Francisca Estevelina Remond, as plaintiffs, represented in this supreme court by Attorney Hilario Cuevillas Hernandez, against Domingo Pietri et al., as defendants, represented by Attorney Manuel F. Rossy, for the recovery of lands and other matters. The proceedings are pending before us on an appeal in cassation, now appeal, taken by counsel for the plaintiffs from the judgments of the Court of First Instance of San Germán and of the *audiencia,* which read as follows:

"*Judgment.*—In the city of San Germán, December 11, 1895. Attorney Eduardo Acuña Aybar, judge of first instance thereof and of its judicial district.

"A hearing was had in this declaratory action of greater import instituted by Francisca Evelina Remond y Vasalle, widow of Vergés, sixty-four years of age, a landowner and resident of Ponce, and Maria Vergés y Remond, married, engaged in domestic duties, twenty-eight years of age, also a resident of Ponce, at first represented by Solicitor Tomás Agrait y Font and defended by Attorney Herminio Diaz Navarro, and now represented by Solicitor Manuel Catalá y Dueño and defended by Attorney Ramón Quiñones, parties plaintiff,

against Domingo Pietri y Pietri, unmarried, an agriculturalist, sixty-
one years of age and a resident of Yauco, represented by Solicitor
Miguel Juan y Llaneras, and defended by Attorney José Marcial
López; Francisco Cedeño y Ayala, married, an agriculturalist, over
thirty years of age, and a resident of Yauco, represented by the same
Solicitor Juan y Llaneras, and defended by the said Attorney López;
Angel Pedro Agostini y Natali, a widower, a landowner, sixty-one
years of age and a resident of Yauco, represented by Solicitor Juan y
Llaneras and defended first by Attorney Juan J. Perea and subse-
quently by Attorney López; Vicente Limarola y Benigni, married,
a laborer, forty-eight years of age and a resident of Ponce, repre-
sented by said Solicitor Juan y Llaneras and defended in the begin-
ning by Attorney López; Francisco Lluch Negroni, married, a
planter, thirty-five years of age and a resident of Yauco, represented
by Solicitor Pedro Maria Rossy y Guerra, and defended first by At-
torney Manuel Solís and subsequently by said Attorney López; Fran-
cisco Pietri, José Gregory y Ramos and Fraticelli brothers in default,
and Rafael Gomez Diaz, declared in default in the beginning, his
death being subsequently established, all of them parties defendant
in regard to the recovery of lands, the annulment of proceedings re-
lating to possession and alienations by public deeds and cancellations
in the registry of property.

"1. The plaintiffs pray that they be granted the ownership of
eight hundred odd *cuerdas* of land which they claim, with the plan-
tations thereon, and that they be left at their disposal, free and
unencumbered; that with regard to their opposition to the titles to
said estate which they produce, the proceedings instituted at the
petition of Messrs. Pietri and Mr. Gomez, to acquire the possession
of 350, 18, 25, 32¼ *cuerdas,* are null and void, as are the sales made
by the latter to Pietri and to Francisco Lloch, that which the latter
made to the Pietris, the proceedings to acquire the possession of
18½ and 4 *cuerdas* more instituted at the petition of Cedeño and
Ayala, the sale made by the latter to Domingo Pietri, the proceedings
to acquire the possession of 260 *cuerdas* instituted at the petition of
the Fraticelli brothers, the sale which the latter made to Vicente
Limarola, and that which the last named made to Angel Pedro Agos-
tini, and claiming that the records of all these instruments appearing
in the registry of property should be canceled as being null.

"2. The plaintiffs base the real action which they bring upon the
fact that Manuel Lopez Garcia, the Intendant General of this Island,
by decree dated December 4, 1834, issued by virtue of the proper
proceedings and a resolution of the superior board of waste lands of

August 2d of the same year, granted to Fernando Maria Pinatell, a captain of engineers, the property and full ownership of 4 *caballerias* of land situated in the *barrio* of Las Vegas, in the district of Rio Chiquito, jurisdiction of Yauco, having the following metes and bounds: Starting from a *guaraguao* on the north side, 40 *cuerdas* were measured off to an opening into a pass called 'Los Almendrones' adjoining the property of Diego de Torres, from said pass on the east 20 *cuerdas* to a *carob* tree, adjoining unclaimed lands; thence, on the south 40 *cuerdas* to a large pit, also adjoining unclaimed lands, and from this pit along the west side to the starting point, adjoining the aforementioned property of Diego Torres, as shown by the document attached and marked exhibit 'A,' which title appears of record at folio five, reverse side, number seventeen, of the book of titles to lands in the principal royal offices of this island; that by instrument of October 8, 1853, a copy of which is attached marked 'B,' Fernando Maria Pinatell sold to Esteban Gallart the said 4 *caballerias* of land, that is to say, 800 *cuerdas*, for the sum of 400 *pesos*, current money, which he acknowledged to have received, such land having the same metes and bounds above mentioned; that by another instrument dated May 31, 1854, (copy of which is attached and marked 'C,') Esteban Gallart sold to Juan Aubret the said 800 *cuerdas* of land, with the same metes and bounds, for 4,000 *pesos macuquinos*, which he acknowledged to have received; that according to a copy of the certificate issued by Francisco Valle, a surveyor (which is attached and marked 'D,') P. L. Vergés, a surveyor, had on March 30, 1855, under a commission from the judge of first instance of Ponce, gone to the district of Yauco, and with the knowledge of the local judge and in the presence of the *comisario* of the *barrio* and of the owners of the adjoining lands, who indicated their respective boundaries and agreed thereto, he surveyed said estate in the manner set forth in said certificate; that by an instrument executed in Yauco on November 12, 1855, (a copy of which is attached and marked 'E,') Juan Aubret sold said land to Pedro Mompesant free of encumbrances, for 5,500 *pesos macuquinos*, which he acknowledged to have received, but stating that the boundaries of the estate having changed since he had acquired it, he made the transfer under the following metes and bounds: Beginning in the south adjoining lands belonging to Juan Antonio Montes, formerly the property of Diego de Torres, from a *guaraguao* stump to the right bank of the Chiquito river, and another laurel stump to the opposite side in a straight line to another *aguacatillo* stump to a small rose apple tree on the Canisales Road, a point adjoining the property of said Montes, to the south Santos

Semidey, to the east the lands formerly belonging to Felix Mattey. Along the east the lands of Silvestre Fraticelli and Juan Bautista Plumey, and along the entire Carnisales or Lares Road to a wild *bacao* at the junction of said road with the so-called Aceitunas Road, that is to say, the dividing line between the jurisdiction of Yauco and San Germán; along the north, adjoining other lands belonging to the estate of José Maria Pacheco, along the Aceitunas Road, which passes over the ride or range which divides said districts to a *mato* or *carob* bean tree on the mountain ridge marked with a cross on the southern side of said Aceitunas Road, which is a point adjoining lands bought by Felipe Ayala of Antonio Cabassa, and along the west adjoining the latter from said tree in a straight line to the said Chiquito River and a small *capá* tree and two sierra palms which are next to each other in said river opposite a dry ravine which, starting from the west ends at this place, said trees forming the second point of division from the said Cabassa property, and from this point following the Chiquito River down stream to the *guaraguao* stump mentioned in the beginning, the point indicated adjoining the said property of Antonio Montes; that Pedro Mompesart died on January 8, 1857, leaving a closed will executed on August 10, 1856, so declared by an order of July 10, 1860. In the absence of heirs by force of law, Pedro Lázaro y Vergés was instituted the heir of all his property, accessions and rights, among which is mentioned the estate of eight hundred odd *cuerdas* stated to be subject to pending litigation which his heirs were to prosecute as they saw fit. Upon the death of Mompesart his heir entered upon the possession of the 800 *cuerdas*. In the same year, 1860, Felipe Ayala and Silvestre Fraticelli each made application to the Governor General for 400 *cuerdas* of the said 800 *cuerdas,* considering same to be unclaimed land inasmuch as neither the original grantee Pinatell nor his successors had complied with the conditions of cultivation which had been imposed upon him in the grant. The proper proceedings were instituted on these petitions, and on September 16, 1863, the board of unclaimed lands rejected the applications of Ayala and Fraticelli. On July 20, 1875, Celestino Arizmendi, a resident of Yauco, denounced to the Governor General the trespass upon lands which he claimed belonged to him, denouncing the trespassers and presenting a number of documents proving his ownership, the principal among them being a deed of sale in his favor executed by Felipe Ayala, and a private contract of assignment by his brother-in-law José Maria Rodríguez of 200 *cuerdas* situated in the *barrio* of Vegas, which had been granted to him by the superior board of unclaimed

lands and to which he had not been able to obtain a title of protection on account of the opposition of Pedro Lázaro Vergés, in proceedings against said Rodríguez in the San Germán court. An inquiry having been made into these matters it appeared that all the trespassers denounced involved unclaimed lands and not lands belonging to Arizmendi, who was found not to own lands of any kind. The record then was sent to the inspector of forests who requested that he should be informed of the result of the opposition of Vergés to the grant of Jose Maria Rodriguez which information was furnished him. On October 5, 1866, the Governor General issued a decree in accordance with the opinion of the inspector of forests ordering, among other things, the seizure by the state of the lands in litigation, and upon the order being carried out on December 14th of the same year, Pedro Lázaro Vergés requested the suspension of these proceedings and took a 'contentious-administrative' appeal in which judgment was rendered on April 25, 1869, in his favor, the order of October 5, 1866, being vacated. This judgment was affirmed by a royal decree of February 20, 1882, and the order for its execution placed thereon on May 3, 1882, the result of the proceedings between Vergés and José María Rodriguez in the San Germán court remaining pending (certificate at folio 37). On September 3, 1884, Pedro Lázaro Vergés died, leaving a will executed in the notarial office of Francisco Parra on June 9, 1883, which stated that he was married to Francisca Evelina Remond, by whom he had had two children, Juan Pedro Arturo and Maria Terecia Horacie, whom he constituted his sole and universal heirs, and that the marriage contributions had consisted of 10,000 *duros* by each spouse (documents at folios 59 and 66). Juan Pedro Arturo Vergés Remond having died, his mother Francisca Evelina Remond was, by order of March 16, 1893, declared to be his intestate heir (copy at folio 67). By an instrument executed in this city on October 21, 1893, Heraclio Rodríguez y Pacheco, under a sufficient power of attorney from his father José Maria Rodríguez y Arredondo declared in the name of the latter that he abandoned and discontinued any action and waived any right which he might have to the two hundred *cuerdas* of land for which he applied to the Governor General as unclaimed lands and which gave rise to the litigation instituted and prosecuted by Pedro Lázaro Vergés, because Rodríguez was fully convinced that said land was situated within the perimeter of the 800 *cuerdas*, the property and ownership of which vested in Vergés and now in his succession (copy folio 70). In view of these documents the record of the 800 *cuerdas* was made

*proindiviso* and under hereditary rights in favor of María Teresa Oracial Vergés y Remond and María Francisca Evelina Remond, widow of Vergés with the boundaries of the estate at the date of the record, which were the following: On the north, Nicolás Martínez and Manuel Cruz, formerly José Maria Pacheco, Tomás Ramirez, and the said Manuel Cruz, formerly the said Pacheco, and Felipe Ayala, formerly Antonio Cabassa; on the south, Juan Dionicio Aguilera, Lorenzo Velez, Cipriano Galarza, Juan Antonio Morales, Juan Antonio Montes, formerly Basilio and Diego Torres, and Santos Semidey; on the east, Juan Plumet and Silvestre Fraticelli; and on the west, Felipe Ayala, Manuel Alvino, Florencio González, Juan Cedeño, and Victoriano Cruz, the estate as first surveyed being stated to comprise an area of 4 *caballerías* or 805.19 *cuerdas,* 316 hectares, 47 ares, and 68 centiares, said boundaries and the true location of the estate being later rectified in the following manner, according to a certificate issued by the *alcalde* of Yauco; on the north, Carlos Molina, José Molinelli and Antonio Molina; on the south, Domingo Pietri and brothers; on the east, Juan Domingo Pietri, Fernando Amill and Victoriano Torres; and on the west, Angel Pedro Agostini. Domingo and Francisco Pietri, having improperly taken possession of 340 *cuerdas* and then of 50 *cuerdas* more forming part of said estate, which lands they claimed to have acquired by purchase from a number of persons, instituted proceedings to establish their possession of said land; which proceedings were approved by order of June 21, 1886, and recorded in the registry at folios 205 and 209 of volume 7, of the *ayuntamiento* of Yauco, estates numbers 373 and 374, first entries. Rafael Gomez y Diaz, taking possession of 18 *cuerdas* in the same manner, instituted proceedings to establish his possession, which were approved by order of March 15, 1887, being recorded in the registry at folio 60 of volume 9, of the *ayuntamiento* of Yauco, estate number 458, first entry, which land Gomez sold for 2,000 *pesos* to Domingo and Francisco Pietri, by deed executed in Yauco on December 23, 1890, which deed was the subject of the second entry. Gomez took possession of 25 *cuerdas* more of the estate the object of this litigation, and instituted proceedings to establish his possession, which were approved by order of October 20, 1890, being recorded at folio 233 of volume 12 of Yauco, estate number 260, first entry. This land Gomez later sold to Messrs. Pietri by deed of December 23, 1890, the subject of the second entry. By the same deed, recorded at folio 237 of volume 12 of Yauco, estate number 621, second entry, Gomez sold to Messrs. Pietri 32.25 *cuerdas* more, a part of the

estate claimed, with regard to which portion he had previously insti-
tuted possessory proceedings, which were approved by order of Octo-
ber 20, 1890, and which were the subject of the first entry relating to
this real property. Said Rafael Gomez, by deed dated October 27,
1881, and July 8, 1882, executed before Juan Z. Rodríguez, a notary
of Yauco, purchased of José Gregory Ramos 20 *cuerdas* of the estate
claimed, said documents being recorded at folio 100 of volume 13
of Yauco, first entry of estate number 650, which Gomez conveyed to
Francisco Lluch Negroni by deed of December 22, 1890, and which
appears in the second entry relating to said estate. Francisco Cedeño
y Ayala instituted proceedings to establish his possession of 22.5
*cuerdas* of land which he sold to Domingo Pietri by deed dated April
26, 1892, which documents are recorded at folio 184 of volume 13
of Yauco, estate number 667, entries first and third. Messrs, Frati-
celli brothers, and on their behalf Felipe Fraticelli y Pietri, had
further proceedings instituted with regard to the estate claimed, to
establish the possession of 260 *cuerdas* thereof, which proceedings
were approved by order of August 29, 1890. They sold this land by
deed of September 4, 1882, to Vicente Limarola y Benigni, who, in
turn, conveyed it by another deed of March 5, 1890, to Angel Pedro
Agostini; all these transactions being recorded at folios 87 to 100
of the second volume, folios 97 and 102 of the sixth volume of Yauco.
They further base their action on the fact that the proceedings to
effect a conciliation were not successful, according to certificates at-
tached, which appear at folios 94 and 100.

"3. The complaint having been admitted and served on the de-
fendants, the only ones who entered an appearance were Domingo
Pietri, Francisco Lluch Negroni, Francisco Cedeño y Ayala, Vicente
Limarola y Benigni and Angel Pedro Agostini, the default of the
others being entered, with the exception of Rafael Gomez Diaz, who
died subsequently, his heirs being unknown.

"4. With regard to the other absent defendants, José Gregory
Ramos and the Fraticelli brothers, they were cited by notices pub-
lished two consecutive times in the *Official Gazette*.

"5. The defendant Domingo Pietri, before answering the com-
plaint, submitted to the court (folio 245) a copy of a deed of sale
executed in his favor by César de Guillermo, engineer and inspector
of forests, in the name of the State, for 58 *cuerdas* of land, equivalent
to 22 hectares, 56 ares, 53 centiares, situated in the *barrio* of Rubias,
district of Aceitunas, municipal district of Yauco, which, according
to a survey and measurement made by said inspector, were unclaimed
and the property of the State, the sale being made for 4,960.36 *pesetas*

one-half of which was paid in cash at the time of the sale and the balance in instalments. He stated that, as the said 58 *cuerdas* were not recorded in the registry in the name of the State, he had the possession thereof recorded in his name and that of his brother Francisco, in conjunction with other tracts of land, according to the certificate which he also submitted, at folio 251 reverse side, and he alleged that this land being included in this action for recovery, he prayed that the complaint be served on the State, as being bound to the warranty and eviction of the thing sold. This prayer was granted, service being made on the *fiscal* of the criminal *audiencia* of Mayagüez, folio 302, reverse side.

"6. Another defendant, Francisco Lluch Barreras, also prayed before making answer to the complaint, that service thereof be made on Rafael Gómez Díaz, the vendor of the 20 *cuerdas* of land, which the plaintiffs seek to recover, as shown by the copy submitted of the deed which appears at folio 269 and the certified copy of the record at folio 275. This prayer was granted, although notice of the complaint could not be served owing to the death of Rafael Gómez Díaz, and the subsequent voluntary abandonment by said Lluch Barreras.

"7. Solicitor Juan y Llaneras, on behalf of Domingo Pietri y Pietri, in answering the complaint, prayed for judgment in his favor, and that the plaintiffs be enjoined to perpetual silence and the costs taxed against them; and, furthermore, that the nullity be declared and the consequent cancellation ordered of the record of ownership entered in the name of the plaintiffs in the registry of property of lands previously recorded *pro indiviso* in the name of his client and his brother, Francisco Pietri y Pietri, for which purpose he filed a cross-complaint against said plaintiffs by a joint petition, or as may be proper in law, alleging the exception of *since actione agis* and prescription, in a proper case, and making use of the action for annulment in so far as the cross-complaint is concerned, basing the first exceptions upon the fact that although the superior board of unclaimed lands had granted to Fernando Maria Pinatell, on December 4, 1834, 4 *caballerías* of land in the *barrio* of Las Vegas, district of Río Chiquito, in the municipality of Yauco, under the condition that they should be cultivated within a period of two years and that the title of the grant ordered that he should be placed in possession by the judge of the territory, it is a fact that Pinatell did not comply with this provision, as he never obtained the possession of the land granted nor did he comply with the condition under which the grant was made, as he had openly stated and confessed in the proceedings prosecuted in the Ponce court by Pedro Mompesart against Felipe

Ayala, in 1857 and 1858; that in the deeds of sale of this land exe-
cuted by Pinatell in favor of Gallart, by the latter to Aubret and by
him to Mompesart, the sales were simulated and made with an under-
standing as to their value with Pedro Lázaro Vergés, according to the
testimony and confessions of said Gallart and Aubret in the proceed-
ings brought in the Ponce court in 1858, by Pedro Mompesart against
Felipe Ayala involving the working on shares of said lands granted
at folios 218 and 220 of the record; that the survey and measurement
made by Pedro Lázaro Vergés of said 800 *cuerdas,* in the *barrio* of
Las Vegas, although stated to have been made in said certificate with
the knowledge of the local judge and in the presence of the *comisario*
of the *barrio,* and with the consent of the owners of the adjoining
lands, none of whom appear to have authorized the certificate except
Vergés alone; that in 1857 and 1858 an ordinary civil action was
brought in the court of first instance of Ponce by Pedro Mompesart
against Felipe Ayala, to compel him to vacate the estate in Las
Vegas which Mompesart believed Ayala was working on shares; and
in these proceedings, on June 20, 1858, judgment was rendered in the
first instance, it being held that the sales by Gallart to Aubret had
been fictitious, and that Felipe Ayala was the owner and possessor
of said lands, the complaint being dismissed for want of proof, with
the costs against the plaintiff. This judgment was affirmed by the
Royal *Audiencia* of Porto Rico on March 29, 1859, this being the
pending litigation to which Mompesart had made reference in his will;
that neither Pinatell nor Gallart nor Mompesart nor Vergés ever
possessed the lands granted to the first named, as shown by the fact
that the latter was not given possession by the judge of the territory
of Yauco, the declaration of Pinatell that he had never done any
work whatsoever on said lands, the simulation of the contracts of
purchase and sale above referred to, the result of the ordinary pro-
ceedings instituted by Mompesart against Felipe Ayala, the fact
of the latter having continued in possession of the lands after judg-
ment was rendered, and the fact of the will of Mompesart, in which
he institutes Vergés as the heir to said property, being opened on
July 10, 1860; that although in the record of the lands made at the
petition and in the name of the plaintiffs it is stated that Pedro
Mompesart took possession of such lands on July 1, 1857, accord-
ing to a document which appeared under number eleven in the
record of presentation, it is a fact that this document has not
been introduced in these proceedings and said affirmation is made
void by the fact of Mompesart having died on January 8, 1857, six
months before the alleged taking of possession, and by the action

brought against Felipe Ayala in 1857 and 1858, for the recovery of the same lands which Ayala had possessed before and after the judgment of the superior court of March 29, 1859, which declared him to be the lawful possessor of said lands; that the proceedings instituted by Pedro Lazaro Vergés before the Contentious-administrative Council, against the Governor General, relating to the reversion to the State of unclaimed lands, of which the Council of State took cognizance on appeal, do not refer in any manner to the lands acquired by Domingo and Francisco Pietri, nor did the former owners and possessors thereof take any part in said proceedings; the latter recorded in their name in the registry of property the possession of 340 *cuerdas* of land in *barrio* Rubias, municipal district of Yauco, on July 26, 1886, acquired as follows. One hundred and sixty *cuerdas* by purchase from Rufino Ramos in 1860; 5 *cuerdas* by purchase from Anastasio Cruz in 1876; 58 *cuerdas* by purchase from the State in 1877; 60 *cuerdas* by purchase from Juan Cedeño in 1884; 12 *cuerdas* from Ramon Pacheco in 1884, and 30 *cuerdas* from Eugenio Rodríguez in 1884; that the 160 *cuerdas* bought of Rufino Ramos had been acquired by the latter as follows: Sixty *cuerdas* of land which had belonged to and been possessed by Agustin Sabater and Eugenio Rodríguez Feliciano until the year 1834, when they conveyed it to Felipe Ayala, who continued in peaceful possession as the owner thereof until March 7, 1856, when he conveyed it by public deed to Rufino Ramos, who held it in possession as owner thereof until April 28, 1871, when he sold it by public deed to the Pietri brothers; the other 100 *cuerdas* of land had been held in possession of Eugenio Rodríguez Feliciano until the year 1834, when he conveyed the same to Ayala, the latter possessing it until May 14, 1862, when he sold it by public deed to Rufino Ramos, who likewise possessed it until the year 1871, when he conveyed the same to the Pietri brothers; that the 5 *cuerdas* purchased of Anastacio Cruz in 1876 had been held in possession by Felipe Ayala from before 1834 to the year 1862, when Ayala conveyed them to Rufino Ramos, who continued in possession thereof until the year 1864, when he sold them to Anastacio Cruz; the latter held them as owner until 1876, in which year he sold them to the Pietri brothers, who hold them in peaceful possession as owners; that the 15 *cuerdas* purchased of Antonio Ramos in 1876 were possessed by their owner Felipe Ayala from before 1834 until 1857, when he sold them to Rufino Ramos, who continued in possession until 1866, when he conveyed them to Antonio Ramos, the latter remaining in possession thereof until 1876, when he sold them to the Pietri brothers; that the latter, on October 13, 1877, acquired by purchase from the

State 58 *cuerdas* of land, according to a deed executed in their favor by César de Guillermo, a forestry engineer, in the name and on behalf of the State, and by virtue of this complaint the representative of the State has been summoned in warranty and eviction; that the 60 *cuerdas* purchased by the Pietri brothers of Juan Cedeño in 1884 were possessed by Felipe Ayala from before 1834 to June 28, 1887, when Ayala sold them by public instrument to Juan Bautista Montaggioni, who held them until April, 1873, when he sold them by private instrument to Andres Agostini, who continued to possess them until December 5, 1876, when he sold them by public instrument to Juan Cedeño, the latter remaining their possessor until May 28, 1884, when he conveyed them by public deed to the Pietri brothers, the number of *cuerdas* being fixed at 50, with the understanding that if there were a larger amount of lands within the limits specified it should belong to the purchasers; for which reason, upon the property being surveyed, 60 *cuerdas* recorded were found to be included within the said boundaries; that the 12 *cuerdas* bought of Ramón Camacho in 1884 were held by Felipe Ayala since before 1834 until 1841, when he sold them to Leon Avilés y Vargas, who continued in possession thereof until 1882, when he sold them to Ramón Camacho, who recorded them in the registry of property and who continued in possession until May 7, 1885, when he sold them to the Pietri brothers by public deed, and although 14 *cuerdas* were fixed in the instrument the survey made later shows 12 only; that the 30 *cuerdas* acquired of Eugenio Rodríguez formed part of an estate called 'Josefina,' formerly 'Manuela,' the property of Manuel Olivieri, who sold them to Rodríguez on March 17, 1872, which deed was recorded in the registry of property on April 25, 1885, Olivieri having acquired the ownership and possession of the land by purchase of 60 *cuerdas* at public sale in the bankruptcy proceedings of Domingo Santiago, and 70 *cuerdas* purchased of a number of persons; that the 50 *cuerdas* recorded in the name of the Pietri brothers at folio 209, volume seven, of Yauco, valued at 10,000 *pesos* and comprised within the 805 *cuerdas* claimed by the estate of Vergés, as stated in the complaint, situated in *barrio* Rubias, while the 50 *cuerdas* are situated in the *barrio* of Río Prieto, in the western part of Yauco, according to the record of the 18 *cuerdas* purchased of Rafael Gomez Diaz under a deed dated December 23, 1890, 10 *cuerdas* had been held by Felipe Ayala, their former owner, since before 1834, as the remainder of the 200 *cuerdas* which he had acquired by purchase of Agustin Sabater, until the year 1867, when he sold them to Gregorio Santiago, and the said Ayala since before the year 1834, had been the owner and possessor of 50 *cuerdas*

in the *barrio* of Vegas, municipal district of Yauco, which he sold to Santiago Ruiz by public deed, on July 28, 1853, of which Ruiz privately sold 8 *cuerdas*, to Gregorio Santiago in February, 1867, Santiago continuing to possess the two tracts of 10 and 8 *cuerdas* until November 5, 1881, when he conveyed them to Santiago Chiaramonte by deed of said date, Chiaramote remaining in possession until January 11, 1885, when he sold them privately to Rafael Gomez Diaz, who recorded his title in the registry of property on April 14, 1887, and who continued in possession until December 23, 1890, when he sold them to the Pietri brothers, who likewise had them recorded in the registry of property; that the 25 *cuerdas* purchased of Rafael Gomez Diaz by deed of December 23, 1890, had been peacefully possessed by their former owner Felipe Ayala since before 1834 until the year 1856, when he sold them to Rufino Ramos, who held them is possession until the year 1862, when he sold them to Anastacio Cruz, who possessed them until the year 1876, when he sold them to Rafaeel Gomez Diaz, who had his title recorded in the registry of property on December 6, 1890, then selling them to the Pietri brothers by public deed on December 23, 1890, which deed was also recorded in the registry; that the 32.25 *cuerdas* purchased of Rafael Gomez Diaz on December 23, 1890, had been possessed by their previous owner since before 1834 until the year 1843, when he sold them to Sebastian Ramos who continued in possession thereof until 1859, when he sold 25.25 *cuerdas* to Maria Martina Rosario y Perez, and 7 *cuerdas* to Andrés Avilés y Ramirez, who possessed these tracts until the year 1879, when they conveyed them to Rafael Gomez Diaz, who recorded his title in the registry of property, holding them as owner until December 23, 1890, when he sold them to the Pietri brothers, who recorded their title in the registry; that the 20 *cuerdas* acquired of Francisco Lluch Negroni, the latter had recorded in the registry of property since May 4, 1891, having acquired them by purchase from Rafael Gomez Diaz by deed of January 13, 1888, and Gomez had acquired them of José Gregory y Ramos by deed of October 27, 1881, and July 8, 1882; that the 227 *cuerdas* purchased of Francisco Cedeño by deed of June 7, 1893, recorded in the registry, are not comprised within the boundaries of the lands claimed by the plaintiffs which, with the various tracts of land acquired by the Pietri brothers, constitute a coffee plantation mostly under cultivation, with establishments, machinery, houses and other usual appurtenances, on which its owners and possessors have been paying taxes to the State and municipality, the estate being valued at 40,000 *pesos;* and that the former owners of the various tracts of land which for the estates described, of which

the Pietri brothers are the lawful owners, paid the State and the municipality the territorial tax assessed thereon during the years they respectively possessed them; and alleging with reference to the cross-complaint that the plaintiffs state in the facts set forth in the complaint that the various estates recorded in the name of Pietri brothers, whose folios, books and numbers are therein specified, are situated within the perimeter of the four *caballerías* of land granted in 1834 to Fernando Maria Pinatell, which are the subject-matter of the same complaint; that notwithstanding this affirmation, on September 20, 1893, subsequently to the records of the Pietri brothers, the plaintiffs sought and obtained the record in their names of the four *caballerías*, or 805.19 *cuerdas*, in the registry of property, presenting therefor titles of a date prior to those upon which the records made in favor of the Pietri brothers were based; that if the affirmation of the plaintiff to the effect that the tract of land consisting of the various estates of the Pietri brothers recorded in 1886, 1887, 1890 and 1892, is situated within the same tract that is the subject-matter of their complaint, were true, it would be evident that the ownership of the same real property had been recorded in the name of different persons and a differently numbered estate in the registry; the complaint sets out that Pedro Lázaro Vergés died on September 3, 1884, leaving a will by which he constituted as heirs his two children, Juan Pedro Arturo and Maria Teresa Horacie, the former having died on February 18, 1893, and by order of March 16th following, his mother, Francisca Evelina Remond, was declared his intestate heir, and had recorded in her own name the property of her son which he had inherited from his father, without such property having previously been recorded in the name of her said son.

"8. Said Solicitor Juan y Llaneras, as the attorney in fact of Domingo Pietri, upon answering the complaint, attached an unauthenticated copy, folio 304, of the order of the Ponce court of June 22, 1858, dismissing the complaint filed by Pedro Mompesart in an ordinary civil action, which he had brought against Felipe Ayala to compel him to vacate the 'Las Vegas' estate which he was working on shares, to render an accounting and make payment, the grounds upon which the complaint was based being the same as those stated by Pietri in his answer. This order was affirmed by the *Audiencia Territorial* on March 23, 1859, on the ground that no question of ownership and survey had been raised. He also attached a certificate (folio 310) issued by the registrar of property of this judicial district on July 27, 1886, relating to the records of possession made in favor of Domingo and Francisco Pietri, of two rural estates, one having 340 *cuerdas,* situated

in the *barrio* of Rubias, in the municipal district of Yauco, which the owners stated they had acquired without a written title by purchase of 160 *cuerdas* from Rufino Ramos, 5 *cuerdas* from Anastacio Cruz, in 1876, 15 *cuerdas* from Antonio Ramos in the same year, 58 *cuerdas* from the State, in 1877, 60 *cuerdas* from Juan Cedeño, 12 *cuerdas* from Ramon Camacho, and 30 *cuerdas* from Eugenio Rodríguez, in 1884, and the other 50 *cuerdas* in the *barrio* of Rio Prieto, in the western part of Yauco, which they stated they had purchased in 1874, 25 *cuerdas* from Antonio Seguí, and the other 25 *cuerdas* from Partalatín Almodovar, in 1885; a certified copy (folio 317) of a deed executed in Yauco before the ordinary Alcalde, Juan Rosas, on March 7, 1856, relating to the sale by Felipe Ayala to Rufino Ramos of 60 *cuerdas* of land more or less, with some coffee and banana plantations, in the *barrio* of Vegas, jurisdiction of Yauco, which Ayala stated he had purchased more than twenty years before from Agustin Sabater and Enrique Rodríguez Feliciano, the sale being made for 300 *pesos macuquinos* received, which sale was recorded in the registry on March 8, 1894; another certified copy (folio 320) of a deed executed in Yauco before Notary Isidoro Arroyo, May 14, 1862, by Felipe Ayala, conveying to Rufino Ramos 100 *cuerdas* of hilly land in the *barrio* of Las Rubias, jurisdiction of Yauco, of which 16 *cuerdas* were planted in bananas and coffee, acquired from Enrique Rodríguez Feliciano, the vendor stating that he had made a justification which formed part of the record of the action he had brought against Pedro Lázaro Vergés, which he had won in the first instance, according to a final judgment of June 22, 1858, affirmed on appeal on March 29, 1859, which sale he made for 300 *pesos* duly received, and which was recorded in the registry of property on March 8, 1894; another certified copy (folio 324) of a deed executed in Yauco before Notary Manuel Solís, on April 28, 1871, by Rufino Ramos, relating to a sale in favor of Domingo and Pablo Francisco Pietri, of 160 *cuerdas* of land more or less, about seventy of them planted in coffee and the remainder uncleared and pasture land, situated in the *barrio* of Rubias, jurisdiction of Yauco, which Ramos had acquired by purchase from Felipe Ayala by deeds dated March 7, 1856, and May 14, 1872, the price of the sale having been 60,000 *pesetas*, part of it received and the balance payable in instalments, such sale having been recorded in the registry of property on the same date as the previous sales, and by virtue of the petition (folio 326) made to the registrar by Domingo Pietri; another certified copy (folio 329) of an instrument executed in Yauco before Notary Manuel Solís, on June 28, 1867, by Felipe Ayala, conveying to Juan Bautista Montagioni 50 *cuerdas* of land more or less, all of

them planted in coffee and bananas, in the *barrio* of Rubias, jurisdiction of Yauco, acquired more than thirty years before by purchases from Agustín Sabater and Enrique Rodríguez Feliciano of a larger number of *cuerdas,* the sale having been made for 4,000 *escudos,* part paid in cash and the remainder in instalments, and recorded in the registry on March 8, 1894; another certified copy (folio 334) of a deed executed in Yauco before Notary Manuel Solís, on December 5, 1876, by Andrés Agostini, relating to the sale to Juan Cedeño of 50 *cuerdas* of land more or less, all planted in coffee and bananas, in the *barrio* of Rubias, jurisdiction of Yauco, which he had acquired by purchase under a private document, from Juan Bautista Montaggioni, on April 30, 1873, the sale having been made for the price of 1,600 *pesos,* part in cash and the remainder in instalments, and having been recorded in the registry on said date of March 8, 1894; another certified copy (folio 339) of an instrument executed in Yauco before Notary Juan Z. Rodríguez, on March 8, 1884, by Juan Cedeño y Caraballo, relating to the sale to Francisco and Domingo Pietri y Pietri, of 50 *cuerdas* of land more or less, planted in coffee and bananas, in the *barrio* of Rubias, jurisdiction of Yauco, which he had acquired by purchase from Andrés Agostini by a deed of December 5, 1876, the sale having been made for 2,500 *pesos* duly received, and having been recorded with the other sales on May 8, 1894, by virtue of the petition (folio 343) made to the registrar by Domingo Pietri y Pietri; a certificate (folio 345, reverse side) issued by the registrar of property on February 15th of the current year, comprising the record of possession made in favor of Ramón Camacho, of 14 *cuerdas* of land in the *barrio* of Rubias, jurisdiction of Yauco, which he stated he had acquired in 1882 by purchase from Leon Avilés y Vargas, without a written title; a certified copy (folio 348) of a deed executed in Yauco before Notary Juan Z. Rodríguez, on May 7, 1885, by Ramon Camacho y Montes, relating to the sale to Domingo and Francisco Pietri y Pietri of 14 *cuerdas* of coffee and banana lands in the *barrio* of Rubias, jurisdiction of Yauco, which he had acquired from León Avilés y Vargas, the sale having been made for 800 *pesos* duly received; and a certificate (folio 352, reverse side) issued by the registrar of property on February 23, 1894, relating to the record of ownership in favor of Eugenio Rodríguez y Nieves of a coffee plantation called 'Josefina,' formerly 'Manuela,' situated in the *barrio* of Rubias, municipal district of Yauco, having an area of 130 *cuerdas,* acquired by purchase from Manuel Olivieri by a deed of May 17, 1872, of which Olivieri had acquired 60 *cuerdas* at a public sale of the property of Domingo Santiago, a bankrupt, and the other sixty by purchase from a number of

persons, the plantation being subject to a mortgage in favor of a number of creditors and another in favor of Eugenio Rodríguez; said certificate comprises also the record of ownership in favor of Domingo and Francisco Pietri of 30 *cuerdas* more or less segregated from said 'Josefina' estate, acquired from Eugenio Rodríguez y Nieve by a deed executed in Ponce on May 30, 1886; a certified copy (folio 356) of a deed executed by Eugenio Rodríguez y Nieves, on said May 31, 1886, relating to the sale of 30 *cuerdas* of land to Domingo and Francisco Pietri; a certificate (folio 366, reverse side) issued by the registrar of property on February 22, 1894, referring to the record of possession in favor of Domingo and Francisco Pietri of 50 *cuerdas* of land, planted in coffee and bananas and uncleared, in the *barrio* of Rio Prieto Poniente, jurisdiction of Yauco, 25 *cuerdas* of which had been acquired from Antonio Sguí in 1874, and 25 *cuerdas* more from Portalatín Almodovar, in 1885, the certificate including also the cautionary notice of these proceedings; a certified copy (folio 370) of a deed executed in Yauco on February 15, 1867, by Felipe Ayala, involving the sale to Gregorio Santiago of 10 *cuerdas* of land, five of them planted and situated in the *barrio* of Rubias, jurisdiction of Yauco, with the remainder of the 200 *cuerdas* possessed by Ayala which he had acquired by purchase from Agustin Sabater, the sale being made for 80 *escudos* duly received, the copy containing a note to the effect that on November 5, 1881, Gregory Santiago had sold this land to Santiago Chiaramonti; an unauthenticated copy (folio 372) of a deed executed in Yauco on July 28, 1853, by Felipe Ayala, in regard to the sale to Santiago Ruiz of 50 *cuerdas* of uncleared land in the *barrio* of Vegas, jurisdiction of Yauco, acquired by different purchases of a number of owners, the sale having been made for 75 *pesos*, received; a certificate (folio 375) issued by the registrar of property on February 23, 1894, comprising a number of records, one of possession in favor of Rafael Gomez Diaz of 18 *cuerdas* of coffee, banana and uncleared land in the *barrio* of Rubias, jurisdiction of Yauco, acquired by purchase from Santiago Chiramonti, on January 11, 1885; the second record of this estate in favor of Domingo and Francisco Pietri y Pietri by purchase from Gomez Diaz, and the cautionary notice against said estate by reason of these proceedings; another record of possession on December 6, 1890, in favor of Rafael Gomez Diaz, of 25 *cuerdas* of land in the *barrio* of Rubias, municipal district of Yauco, in coffee, bananas and pasture acquired more than ten years before by private purchase from Anastacio Cruz; another record of possession in favor of the said Gomez Diaz of 32.25 *cuerdas* of land, in coffee, bananas and pasture, in the *barrio* of Rubias, jurisdiction of Yauco,

which he had acquired more than ten years before; 25.25 *cuerdas* by purchase from Maria Rosario y Perez, and the remaining seven from Antonio Avilés y Ramirez; the second record of this estate in favor of Domingo and Francisco Pietri, acquired by purchase from Gomez Diaz by deed of December 23, 1890, and the cautionary notice against said estate of these proceedings; a certified copy (folio 386) of a deed executed in Yauco on December 23, 1890, by Rafael Gomez Diaz, regarding the sale to Domingo and Francisco Pietri y Pietri of the rural-estates referred to in the preceding records, which title appears recorded on May 4, 1891; a certified copy (folio 393) of a deed executed in Yauco on January 13, 1888, by Rafael Gomez Diaz, in regard to the sale to Francisco Lluch Negroni of 20 *cuerdas* more or less, of pasture lands, with some parts in coffee and bananas, in the *barrio* of Rubias, jurisdiction of Yauco, which he had acquired by purchase from José Gregorio Ramos by instruments of October 27, 1881, and July 8, 1882, the sale having been made for 1,000 *pesos* received, and recorded in the registry of property on May 4, 1891; a certified copy (folio 397) of a deed executed in Yauco on December 22, 1890, by Francisco Lluch Negroni, relating to the sale of said 20 *cuerdas* of land to Domingo and Francisco Pietri y Pietri, for the sum of 1,000 *pesos* received, which title was recorded on May 4, 1891; a certificate (folio 402, reverse side,) issued by the registrar of property on January 13, 1888, comprising certain records, one in favor of Francisco Lluch Negroni of the 20 *cuerdas* purchased from Rafael Gomez Diaz, another relating to the same land in favor of Domingo and Francisco Pietri y Pietri by purchase from Lluch Negroni, and the cautionary notice against said estate by reason of this action; a certificate (folio 406) issued by the *alcalde* of Yauco on February 25, 1894, setting forth that Felipe Ayala had paid taxes on agricultural property in 1834, without stating the sum nor the amount of land; that in 1835 he had paid 1 *real* and 4 *maravedises;* in 1837, 2 *reales;* in 1838, on 24 *cuerdas* of land; in 1839, on 26 *cuerdas;* in 1840, on 26 *cuerdas;* in 1840, 26½ *cuerdas;* in 1841, on 125 *cuerdas;* in 1842, 2.50 *pesos;* in 1843 and 1844, on 140 *cuerdas;* in 1845 and 1846, 200 *cuerdas;* in 1847, on 212 *cuerdas;* in 1848, on 272 *cuerdas;* in 1849, 1850, and 1851, on 349 *cuerdas;* in 1852, on 166 *cuerdas;* in 1853, 3 *pesos;* in 1854, on 260 *cuerdas;* in 1855, on 379 *cuerdas;* in 1856, on 400 *cuerdas;* in 1859, 3.15 *pesos;* in 1861, 11.03 *pesos;* all in the *barrio* of Vegas, continuing in that of Rubias; in 1862, 6.25 *pesos;* in 1863, 2.20 *pesos;* in 1864 to 1865, 6.25 *pesos;* in 1865 to 1866, 3.640 *escudos;* in 1866 to 1867, 14.137 *escudos;* another certificate (folio 407) issued by the said *alcalde* of Yauco on January 25, 1894, stating that Rufino Ramos

had paid taxes on agricultural lands in the *barrio* of Vegas until 1861, and in the *barrio* of Rubias in 1856 on 68 *cuerdas;* in 1857, on 46 *cuerdas;* in 1858, on 92 *cuerdas;* in 1859, 4.20 *pesos;* in 1860, on 90 *cuerdas;* in 1861, 13.47 *pesos;* in 1862, 15.62 *pesos;* in 1863, 5.56 *pesos;* in 1864 to 1865, 21.87 *pesos;* in 1865 to 1866, 22.860 *escudos;* in 1866 to 1867, 51.884 *escudos,* and in 1869 to 1870, 8 *escudos;* another certificate (folio 408) issued by the said *alcalde* of Yauco on February 25, 1894, stating that Anastacio Cruz had paid as agricultural taxes in the *barrio* of Rubias, in 1864 to 1865, 1.87 *pesos;* in 1865 to 1866, 1.660 *escudos;* in 1866 to 1867, 2.120 *escudos;* in 1869 to 1870, .080 *escudo,* and 15 *pesetas* in 1875 to 1876; another certificate, folio 409, issued by the said *alcalde* of Yauco on February 25, 1894, stating that Antonio Ramos had paid agricultural taxes in the *barrio* of Rubias in 1866 to 1867, 2.120 *escudos;* 1869 to 1870, .050 *escudo,* and 1876 to 1877, 1.02 *peso;* another certificate issued by the same *alcalde* on the same date, folio 410, stating that Juan Bautista Montaggioni had contributed 2 *escudos* as agricultural tax in the *barrio* of Rubias in the assessment of 1869 to 1870; another certificate (folio 411) issued by the *alcalde* of Yauco on the said date, stating that Juan Cedeño appeared in the *barrio* of Rubias as paying an agricultural tax of 49.20 *pesos* in 1876 to 1877; 226.60 *pesos* in 1877 to 1878; 42 *pesos* in 1879 to 1880; 7.50 *pesos* in 1880 to 1881; 10 *pesos* in 1881 to 1882, and 12 *pesos* in 1882 to 1883, and 1883 to 1884; another certificate issued by the same *alcalde* on the same date (folio 412) to the effect that Dionisio Avilés appeared as paying agricultural taxes in the *barrio* of Rubias, on 5 *cuerdas* of land, in 1841, and 4.90 *pesos* in 1861; another certificate issued by the aforementioned *alcalde* on the same date (folio 413) to the effect that Ramón Camacho appeared as paying agricultural taxes in the *barrio* of Rubias, in the sum of 2 *pesos* in 1882 to 1883, and 3 *pesos* in 1883 to 1884; another certificate (folio 414) issued by the *alcalde* of Yauco on said February 25, 1894, stating that Manuel Olivieri appeared as paying 13.650 *escudos,* as agricultural tax in the *barrio* of Naranjo in the year 1866 to 1867; another certificate issued by the same *alcalde* on the same date (folio 415) to the effect that Eugenio Rodríguez paid agricultural taxes in the *barrio* of Rubias, in 1875 to 1876, amounting to 75 *pesetas,* and 86.75 *pesos* in 1882 to 1883; another certificate issued by the said *alcalde* and on the same date (folio 416), stating that Gregorio Santiago had paid in the *barrio* of Rubias agricultural taxes amounting to 15 *pesetas* in 1875 to 1876, 2.20 *pesos* in 1876 to 1877, 10 *pesos* in 1887 to 1878, 2.60 *pesos* in 1879 to 1880, 2 *pesos* in 1880 to 1881, 3 *pesos* in 1881 to 1882, 4 *pesos* in 1882 to 1883, and 1883 to

1884, and 5 *pesos* in 1885 to 1886; another certificate issued by the same *alcalde* on the same date (folio 417) to the effect that Santiago Ruiz paid agricultural taxes in the *barrio* of Vegas amounting to 1 *peso* in 1853, on 60 *cuerdas* in 1855, on 52 *cuerdas* in 1856, .25 in 1857, 58 *cuerdas* in 1858, 1.57 *pesos* in 1859, on 44 *cuerdas* in 1860, 2.45 *pesos* in 1861, and in the *barrio* of Rubias, 2.50 *pesos* in 1862, .88 in 1863, 2.50 *pesos* in 1864 to 1865, 2.740 *escudos* in 1865 to 1866, 7.068 *escudos* in 1866 to 1867, and .080 in 1869 to 1870; another certificate issued by the same *alcalde,* on the same date, (folio 418) stating that Rafael Gomez appeared as a taxpayer on agricultural lands in the *barrio* of Rubias, with 3 *escudos* in 1869 to 1870, 75 *pesetas* in 1875 to 1876, 18.45 *pesos* in 1876 to 1877, 85 *pesetas* in 1877 to 1878, 15.75 *pesos* in 1879 to 1880, 10 *pesos* in 1880 to 1881, 17 *pesos* in 1882 to 1883, 12.50 *pesos* in 1883 to 1884, 15 *pesos* in 1885 to 1886, 25 *pesos* in 1886 to 1887, 27.50 *pesos* in 1887 to 1888, 25 *pesos* in 1888 to 1889, 28 *pesos* in 1889 to 1890, and 35 *pesos* in 1890 to 1891; another certificate of the same date, issued by the same *alcalde* (folio 419) to the effect that Sebastian Ramos paid as agricultural taxes in the *barrio* of Vegas, on 125 *cuerdas* in 1844, on 50 *cuerdas* in 1845 and 1846, on 100 *cuerdas* in 1847, on 50 *cuerdas* in 1848, and on 30 *cuerdas* in 1849; another certificate issued by the same *alcalde* on the same date (folio 420) to the effect that Maria Martina Rosario had paid agricultural taxes in the *barrio* of Vegas until 1861, and in that of Rubias, in 1859, 2.10 *pesos;* in 1860, on 20 *cuerdas* of land; in 1862, 2.50 *pesos;* in 1863, .88; in 1865 to 1866, 2.480 *escudos,* and in 1866 to 1867, 2.827 *escudos;* another certificate issued by the same *alcalde* on the same date (folio 421) to the effect that Domingo Pietri and his brother, or the Pietri brothers, appeared as paying territorial taxes in the *barrio* of Rubias, from 1875 to 1894, as follows: six hundred and forty-five *pesetas* in 1875 to 1876, 187.50 *pesos* in 1881 to 1882; in the same *barrio,* 276.50 *pesos* in 1882 to 1883; 275 *pesos* in 1883 to 1884; 240 *pesos* in 1885 to 1886; 227.50 *pesos* in 1886 to 1887; 262.50 *pesos* in 1887 to 1888; 280 *pesos* in 1888 to 1889; 185 *pesos* in 1889 to 1890; 200 *pesos* in 1890 to 1891; 375 *pesos* in 1891 to 1892, 1892 to 1893, and 1893 to 1894; and, finally, a certificate (folio 422, reverse side,) issued by the registrar of property on February 22, 1894, relating to the record of the 4 *caballerías* of land in favor of the plaintiffs.

"9. Francisco Cedeño y Ayala, another defendant, answered the complaint (folio 556) praying that judgment be rendered in his favor, with the costs against the plaintiffs, on the ground that the 22.5 *cuerdas* of land claimed by the plaintiffs are not comprised nor situated within the estate of said defendant, as he had acquired

them in 1887 by purchase from their lawful owners and possessors, Juan Cedeño. Asunción Montes, Jose Ramón Vega, Monserrate Ayala, and Isidra Cruz, in different portions and lacking a written title, he instituted proceedings to establish possession which he had recorded in the registry, later selling the land by instrument of June 7, 1893, to Domingo Pietri, which instrument was also recorded in the registry.

"10. The other defendants, Pedro Angel Agostini and Vicente Limarola, through their solicitor (folio 613) also answered the complaint praying for judgment in their favor and the taxation of costs against the party plaintiff, because the latter would have to prove that the lands of Agostini are the same as those situated within the 4 *caballerías* granted by the State of Pinatell; and even assuming that they were part of such lands, an action to recover the same could not be brought owing to its having prescribed, because in any case the present possessors had acquired the same with a just title and in good faith. They stated in support of their claim that by deed executed in this city on September 4, 1882, the brothers Luis Felipe, Alejandro and Pablo Simon Fraticelli y Pietri, who constituted the firm of Fraticelli Brothers, sold to Vicente Limarola y Benigni the 'Gloria' coffee plantation, having an area of 260 *cuerdas,* with two encumbrances, one for 6,500 *pesos* in favor of Mariano Bartolomey, representing the price of 80 *cuerdas* of land of said estate, and another of 4,000 *pesos* in favor of Ana Emilia Fraticelli, the product of shares in the ownership of said estate, Limarola subsequently constituting another mortgage in favor of Agostini for 18,400.89 *pesos;* that by another deed of March 5, 1890, Limarola awarded said estate in payment to Agostini, recording it in the registry, Agostini paying the first mortgages according to a receipt dated February 26, 1891, which was recorded in the registry; that Agostini possesses this estate under a legal title and in good faith, and that it does not form part of the 800 *cuerdas* which the State granted in 1834 to Fernando Maria Pinatell, but of those which the State seized, situated to the north of the land granted to Pinatell, according to a plan submitted; that it cannot be proven that the lands sought to be recovered are possessed by Agostini, because all the work of investigation and survey performed by professional technical men for this purpose has been fruitless; that Limarola had been in quiet and peaceful possession of the 260 *cuerdas* from 1882 to 1890, when he sold them to Agostini, the latter continuing in possession which dates back more than ten years without counting the time such land was possessed by Fraticelli brothers; that the said 'Gloria' estate

having been previously recorded in the registry, if it had formed part of the 800 *cuerdas* granted to Pinatell, the latter should not and could not have been recorded subsequently; that is to say, in September, 1890, by virtue of a different title, and that the change in the boundaries made in the registry at the petition of the Estate of Vergés, cannot prejudice anyone.

"11. Said defendants, upon answering the complaint, attach as documents supporting their rights the certificates at folios 564 *et seq.* issued by the assistant inspector of forests, in view of the record of the proceedings on the seizure and sale to Messrs. Domingo Pietri, Pablo Simon Fraticelli and Pedro Mateo Fellinch of certain lands in the *barrio* of Rubias, district of Las Aceitunas, jurisdiction of Yauco, to which Celestino Arizmendi claimed he was entitled, and relating to the record of an incidental issue which arose in connection with the execution of the judgment rendered in the contentious-administrative proceedings brought against such seizure by the State, by Pedro Lázaro Vergés, in which is inserted the rough draft of a report made by the inspector of forests, to the effect that a complaint of Pedro Gabriel Carreras, as the attorney in fact of the widow of Vergés, as to the manner in which the survey of the lands granted to Pinatell is to be made, should be dismissed, and that said survey having been made and the plan prepared, it is to be deduced therefrom that the lands to which the title refers being situated to the east of the river and Almend Pass, while the property sold by the State is situated to the north of said pass, the latter can in no wise form part of those to which the title applies; the certificate contained also the memorandum made on December 7, 1885, by the chief engineer of forests and Lorenzo S. de Vizcarrondo, an expert appointed by the Vergés Estate, in the presence of Gabriel Carreras, the attorney in fact of said Estate, relating to the survey of the lands granted to Pinatell, for the preparation of the proper plan, several points being established, and the statement being made that a number mentioned in the grant had disappeared; and, finally, the certificate embodies a communication from the president of the contentious-administrative council, denying the petition of Evelina Remond de Vergés to be placed in possession of the lands; a plan which appeared at folio 578, whence it was removed, relating to the lands which the State seized in the *barrio* of Rubias, and a plan of the grant of 800 *cuerdas* of unclaimed lands in the *barrio* of Las Vegas, made to Fernando María Pinatell; an unauthenticated copy (folio 580) of the deed executed in San Germán on September 4, 1882, by the firm of Fraticelli Brothers, relating to the sale to Vicente Limarola of the

Gloria estate, subject to the charges to which the defendant Agostini makes reference in his answer; and copies (folios 590 *et seq.*) of the deeds of award in payment by Limarola to Angel Pedro Agostini of the said estate, and receipts for and cancellations of the mortgages encumbering said estate recorded in the registry.

"12. The defendant Francisco Lluch Negroni waived the citation of eviction which he had served on Rafael Gomez Diaz and answered the complaint (folio 674), praying that the complaint be dismissed as to him and that the nullity of the record of the estate of Messrs. Vergés be declared, on the ground that he acquired the estate claimed, by purchase from Rafael Gomez Diaz by deed executed in Yauco on January 13, 1888, recorded in the registry, Gomez having acquired it from José Gregorio Ramos by deed of October 27, 1881, and July 8, 1882, and Ramos likewise having acquired it from Santiago Vivaldi by deed of April 16, 1880; that Lluch Negroni, as well as its former owners, had been possessing and exercising their rights to said estate, peacefully and publicly as owners, paying the State and municipal taxes assessed thereon, without their having as yet been disturbed, nor during the fourteen years previous, in the exercise of their rights of ownership; that Lluch Negroni had legally disposed of the real property upon conveying it by sale to Domingo and Francisco Pietri by deed of December 20, 1890; that the right of Lluch Negroni and of his predecessors in interest had been confirmed by the lapse of time for prescription, because they have enjoyed the consideration of owners publicly and peacefully in good faith and with a just title; that the plaintiffs must prove that the lands they claim are the same which are recorded in the name of Lluch Negroni; that the fact of Messrs. Vergés recording their title in the registry clearly shows that they must refer to other lands different from those recorded in the name of Lluch Negroni, as otherwise they could not have been recorded; and that said plaintiffs have filed their claim to said lands eleven years after the judgment of the Council of State has ceased to have the force of law.

"13. The defendant Lluch Negroni, in answering the complaint, attaches an unauthenticated copy (folio 659) of the deed executed in Yauco on April 17, 1880, by Santiago Vivaldi relating to the sale to José Gregorio Ramos of 20 *cuerdas* of land, planted in coffee and bananas and in pasture, in the *barrio* of Rubias, jurisdiction of Yauco, which he had acquired by purchase from Juan Lázaro Figueroa, by deed of September 13, 1879, which sale was made for the price of 600 *pesos* duly received; another unauthenticated copy (folio 661) of a deed of sale executed in Yauco on October 27, 1881, by José Gregorio

Ramos in favor of Rafael Gomez Diaz, of 10 *cuerdas* of land which form part of the 20 acquired from Vivaldi, the sale being made for 400 *pesos* received; another unauthenticated copy (folio 663) of a deed executed in Yauco on July 8, 1882, by José Gregorio Ramos, in regard to the sale to Rafael Gomez Diaz of the 10 *cuerdas* of land remaining from the 20 he had acquired from Vivaldi, the sale being made for 600 *pesos* received; another unauthenticated copy (folio 665) of a deed executed in Yauco on January 13, 1888, by Rafael Gomez Diaz, in regard to the sale to Francisco Lluch Negroni of the said 20 *cuerdas* of land for the price of 1,000 *pesos,* duly received; and an unauthenticated copy (folio 668) of the order of the Ponce court of June 22, 1858, affirmed by the *audiencia* on March 23, 1889, dismissing the action brought by Pedro Mompesart against Felipe Ayala to compel him to vacate the Vegas plantation, which he was working on shares, to render an accounting and to pay the balance due.

"14. The defendant Domingo Pietri also waived the citation of eviction served on the State with reference to the 58 *cuerdas* of land sold to him by the State, and answered the complaint (folio 714), praying for its dismissal as to him and that the costs should be taxed against the plaintiffs, on the ground that by deed executed in this city on October 13, 1877, after the proper legal proceedings and formalities, the ownership of 58 *cuerdas* of land in the *barrio* of Rubias, district of Aceitunas, municipality of Yauco, which, according to a survey and measurement made by the inspector of forests, were unclaimed and the property of the State, was conveyed to Domingo and Francisco Pietri for a valuable consideration, in the name of the State, the price of the sale having been 4,964.36 *pesetas,* part paid in cash at time of sale and the balance in instalments; that by reason of the land not being recorded in the name of the State, Pietri recorded the possession in conjunction with other tracts of land, on July 26, 1886; that this land has been included in the complaint and that the estate of Vergés having filed a claim with the Intendant General of the Treasury in 1885 for the lands now sued for, the inspector of forests was ordered to make the proper plan; which was done and which showed perfectly that the 58 *cuerdas* of land sold by the State to Messrs. Pietri were not comprised within the perimeter of the 4 *caballerías* granted to Fernando Maria Pinatell in 1834.

"15. To the foregoing answer was attached (folio 693) the plan of the lands in the *barrio* of Rubias referred to in the report of the Contentious-administrative Council of July 10, 1885, made upon the

claim filed by Evelina Remond, widow of Pedro L. Vergés, which plan, according to the copy, appears to be signed by Pedro Tolosa; and unauthenticated copies (folios 695 *et seq.*) of the certificates issued by the assistant inspector of forests, which the other defendant Angel Pedro Agostini had already presented (folio 564 *et seq.*).

"16. The record having been referred to the plaintiff for replication the latter replied (folio 732) praying that the exceptions of the adverse party be overruled, the cross-complaint dismissed, and that the cautionary notice of the latter made in the registry be canceled, setting up as definite facts those contained in the complaint and supplementing them with others deduced from the answers of the defendants, stating that by virtue thereof that the title of the grant was recorded at folio 15, reverse side, under number 17, of the book of titles of lands in the royal offices of this Island; that the concession was made under the explicit condition, under the penalty of revocation of the grant and reversion of the property to the State, that it was to be made productive within two years and that the grantee would pay the fees prescribed by the Royal *Cédula* of January 14, 1878, it being ordered that he be placed in possession; that, according to this history related by Pinatell himself in the statement attached, he was given possession of the real property on December 16, 1834, which property he stated to have the form of a parallelogram, bounded on the east and north sides by the so-called Carrizales and Aceitunas, on the west by the Chiquito River, and on the south by the property of Diego Torres. In the same statement Pinatell states that on May 21, 1841, Juan Troche, a commissioner and lieutenant, with clerks and a forestry surveyor, went to the *barrio* of Las Vegas, district of Río Chiquito, to make a survey of the land granted, which was done. Beginning from the lands of Diego Torres he started from a nearby *guaraguao* tree, which he marked with a cross, and leaving the property of Pinatell on the north he went down to the river and up it to the mouth of a brook called Almendrones, stating that he had measured 40 *cuerdas;* going up this stream he left the concession of Pinatell to the right (the east) until he reached a carob tree on the road and ridge of Aceitunas, which he marked with crosses, stating that he had measured 20 *cuerdas;* he followed said road and crossing the ridge called Carrizales he reached a pit, which was dug for the first time by Pagan, Gonzales, Cruz and other members of the party, stating that he had measured 40 *cuerdas;* from this point, leaving the concession to the right (the west), he reached the Guayabal ridge, and thence down to the starting point, the exact measurement being stated as

20 *cuerdas* to the *guaraguao* adjoining the property of Torres; that this description agrees with that contained in the title of the concession and conforms to the plan attached; that Pinatell began to cultivate the land as soon as he was given possession thereof, turning it over to workers on shares, and that he paid punctually all taxes on the land as long as he held possession thereof; that is to say, from 1834 to 1853; that the deed of sale of Pinatell to Gallart stated that the land was planted and open; that Gallart entered upon possession of the property immediately, paying the taxes until May 31, 1854, when he sold the land to Juan Aubret, who continued paying taxes on said property as long as he held it, and then ceased; that on March 31, 1855, Pedro L. Vergés, a surveyor, upon the petition or Aubret and commissioned therefor by the judge of first instance, surveyed the estate with the consent of the adjoining owners, making the plan attached, which agrees exactly in the figure of its perimeter, in its boundaries which, being natural, could not vary, and in the geographical position of the land to which both refer, with the plan made in 1841 by Pinatell, from which plan the points and boundaries were taken when the estate was sold by Aubret to Mompesart; that the latter subsequently died at the end of 1858, and not in 1857 as the certificate of death erroneously states, as judicial process was served on him on August 20, 1858; that Mompesart took possession of the estate on July 1, 1857, on which date he commenced making payment of the taxes; and having given Felipe Ayala a piece of land to cultivate on shares about the year 1857 or 1858, seeing that Ayala did not give him any of the products and that when demand therefor was made of him he alleged to be the owner of the estate, Mompesart brought an action against him to compel him to vacate the property and render an accounting of the products thereof, in which proceedings judgment was rendered, the complaint having been dismissed with the costs against the plaintiff and the interdict issued against the property of the defendant dissolved. An appeal was taken from this judgment, which was affirmed on May 23, 1859, but an appeal in cassation was taken from the judgment on appeal, the result of which is not known; that during the litigation with Mompesart an interdict was issued against the lands which Felipe Ayala claimed to belong to him, although such interdict was dissolved, there is no evidence that the lands were subsequently turned over to him, but the contrary is shown by the fact that Ayala, on August 1, 1858, prayed the court for permission to continue the litigation as a poor person, on the ground that he had no property, as an interdict had been issued against the little he had had, as stated by two witnesses

and as shown by the certificates issued by the *alcalde* and syndic of the town of Yauco; that upon the death of Mompesart and upon Vergés entering upon the possession of the 800 *cuerdas* in litigation and beginning to pay taxes thereon, Felipe Ayala and Silvestre Fraticelli made a petition to the Governor General in 1860 for the grant of 400 *cuerdas* of the lands granted to Pinatell, claiming that they had reverted to the State on the ground that the conditions of cultivation imposed at the time the grant was made had not been complied with, and upon proceedings being instituted thereon Pedro Lázaro Vergés opposed the petition, and the report of the Ayuntamiento of Yauco having been received, to the effect that the lands actually were those which had been granted to Pinatell, the greatest part of them cultivated by persons who had lived there for more than fifteen years, while no other work had been done on the uncultivated land than some work of little importance by the agents of Mompesart, the board of unclaimed lands rejected the petitions of Ayala and Fraticelli; that Vergés instituted proceedings before the Contentious-administrative Council against the decree of the Governor General of October 5, 1876, which ordered that the State should take possession of the lands the subject of this claim, the council allowing the claim of Vergés and setting aside the decree ordering the seizure, on the ground that Vergés had proved that he was the successor in interest of Mompesart, and that the statement relating to the cultivation of the lands was not true, because according to the reports of the Municipal Council of Yauco and the inspector of forests, the lands were planted in bananas and coffee, Vergés having paid the taxes during the period from 1855, and that if they had not been cultivated by said Vergés this was not a ground for the revocation of the Royal *Cédula,* inasmuch as the lands could be cultivated by the grantees availing themselves of the services of third persons, which decision of the council was affirmed by Royal decree, judgment of the Council of State of February 20, 1882, the order for the execution of which was placed thereon on May 3d of the same year, being published for general information in the Gazette of this island, number 64, of the 30th of the same month; that upon the death of Vergés his Estate prayed the Governor General to be placed in possession of the lands, and the preparation of a sketch having been ordered the engineer Guillermo went to the estate with the other engineer Vizcarrondo, accompanied by Pedro Gabriel Carreras, and in describing their work they were only able to establish the starting point and the mouth of the so-called Almendrones Brook in the Chiquito River; that the inspector of forests subsequently reported

on the matter, the petition of the Estate of Vergés being rejected, but as the latter did not agree to this action they again appealed to the Governor, presenting the plan which Vergés had made in 1855, and then the Contentious Council, by order of the Governor, made a report to the effect that the question of the identity of the land had not been settled because half of the points set out in the grant to Pinatell had disappeared, and upon this report the petition of the Estate of Pedro Lázaro Vergés was again denied; that Domingo and Francisco Pietri are in improper possession of one tract of 300 *cuerdas,* and of another of 50, which form part of the estate whose recovery is sought, and after having had them recorded by virtue of proceedings to acquire title of possession, in which they state that they have no written title, they obtained the record of the deeds which they present relating to the acquisition of the lands, to which the former vendors had no titles of ownership; that the simulations of contracts alleged by the defendant Pietri are not true, and proofs of their being simulations must be presented; that it is not true that Pinatell stated that he had not cultivated the estate, because in the sale to Gallart he stated that the land was partly cleared and planted; that a record of possession does not in any case prejudice the rights of one who has a better right to the ownership of the real property; and that as to the counter-claim brought by Pietri, it may be admitted only if it should be held that his lands are comprised within those claimed in this action, as otherwise it must be decided which of the records is to stand, and that the defect in the record in favor of the widow of Vergés is curable and can be stricken out only if it be proved that Arturo Vergés had left his property to another heir having a better right.

"17. To the replication the plaintiff attached a certificate of survey (folio 729) and a plan (folio 730) signed by J. M. Pinatell, and another plan which was detached and was formerly at folio 731, made by Francisco Valls, as a copy of that made by Surveyor Pedro L. Vergés in April, 1885, by virtue of a commission from the Ponce court upon the petition of Juan Aubret, the owner of a coffee and banana plantation and grazing farm in the district of Río Chiquito, in the *barrio* of Vegas, jurisdiction of Yauco, consisting of 805.19 *cuerdas.*

"18. Upon the petition of the plaintiff it was ordered that all the defendants litigate jointly and that they be defended by one and the same counsel.

"19. The record having been referred to the defendants for rejoinder they did so through the same counsel, praying that judgment

be rendered in the proceedings in accordance with the prayers contained in their respective answers to the complaint, alleging with regard to the defense of Domingo Pietri, in addition to reproducing the facts set forth, that the memorandum and plan made by the forestry engineer in conjunction with the other engineer, Vizcarrondo, and the representative of the Estate of Vergés, show that of the four points fixed in the title of the grant to Pinatell, the existence of one only can be proved, for which reason the identification of the land was impossible, and that the lands which the Government seized in the name of the State in 1876, which it sold to Domingo and Francisco Pietri and others, are different lands from those granted to Pinatell, because the lands referred to in the title being to the east of the river and Almendrones Brook and those sold by the State being to the north thereof, it is impossible that the latter should be a part of those to which the title relates; that the Contentious Council reported on May 27, 1886, that the documents and plans newly presented by the Estate of Vergés did not settle the question of identity, because whatever might be their importance the title of the original grant takes precedence over all of them, in which title in fixing the four boundary points it appears natural that the Aceitunas and Carrizales ridges would have been mentioned, if they had formed the boundaries of the Pinatell grant; that as to the defense of the defendant Cedeño y Ayala, the facts set forth in the answer are reproduced. With regard to Agostini and Limarola, in addition to reproducing such facts, it is alleged that if the record of the litigation between Ayala and Mompesart had disappeared, a summary investigation of the matter should be made; and as to Lluch Negroni, the facts set forth in the answer are reproduced, and it is alleged that the certificate issued by Fernando Maria Pinatell is a private document not having the requisites prescribed by the law; that the plan made by an amateur surveyor is in the same condition as said certificate; that the other plan made by Pedro Lázaro Vergés in 1855 had already been held in the judgment, in the proceedings between Ayala and Mompesart, to be the exclusive work of his predecessor in interest; that no appeal in cassation was taken from the judgment of the *Territorial Audiencia* in the proceedings betweeen Ayala and Mompesart; that the judgment rendered by the Council of State is of an administrative character and in no way prejudices an essentially civil question; that when the Estate of Vergés prayed for the execution of said judgment it could not be done on account of the identity of the lands remaining in abeyance; that the lands referred to in the title of the grant

of Fernando Maria Pinatell are not the same lands which belong to the defendants.

"20. Upon the petition of both parties evidence was taken in the action, that introduced by the parties in support of their respective claims being heard within the proper period therefor.

"21. There appears in the evidence submitted by the plaintiff a certificate (folio 1009) issued by the *alcalde* of Yauco, stating that Fernando Maria Pinatell appeared on the land-tax list as having 800 *cuerdas* of land, paying taxes thereon during the years 1838, 1841, 1843, 1844, 1847, 1849, 1850, 1851, 1852, and 1854, Esteban Gallart not appearing in any capacity; that under the assessment of 1855 Juan Aubret appeared as paying taxes on 800 *cuerdas* of land; that Pedro Mompesart likewise appears on the lists of 1856, 1857, 1858, 1859, 1860, and 1861 as paying taxes on a like amount of land; and, finally, that Pedro Lázaro Vergés also appears on the lists of 1862, 1863, and 1865 as paying taxes on 800 *cuerdas* of land. The following documents were also presented: A certificate (folio 1072) issued by the chief clerk of the central administration of taxes and revenues and auditor of said office, comprising the second section of the record of the proceedings relating to the unclaimed lands in the *barrio* of Aceitunas, jurisdiction of Yauco, showing that Pedro Lázaro Vergés had appealed to the Contentious Council from a decision of the Government relating to the reversion of unclaimed lands to the State; that the Government had asked the inspector of forests for the records relating to Ayala and Fraticelli, a communication from the Ponce court relating to the misappropriation of funds, fraud and embezzlement in the administration of revenues and customs of Guayanilla, asking for statements of the amounts corresponding to deposits made by Simón Fraticelli, Mariano Bartolomey, Domingo Pietri and Mateo Tolinch, under forests, and the reply to this communication; another communication from the Govenrment to the inspector of forests informing him that the *Gazette* of May 25, 1882, contained the royal decree-judgment of the Council of State relating to the appeal of Pedro Lázaro Vergés from the decision of the Government ordering the reversion to the State of certain lands in the *barrio* of Vegas, jurisdiction of Yauco, which were in its possession, in order that he might execute said royal decree, a copy of which was later transmitted to said inspector; the report of the latter to the effect that the lands which the State had seized in the *barrio* of Rubias were entirely different from those granted to Pinatell in Las Vegas, as would be seen from the plan on record (folio 1092); and, consequently, that it would be prejudicial to the State if Vergés were placed in possession thereof

as he desired, because in such case it would be necessary to annul the deeds of sale executed by the State and return the price of such sales to the purchasers and indemnify them for any damages which they might suffer; a copy of the resolution of the Contentious Council ordering the inspector of forests to comply with the provisions of the judgment, without prejudice to any claim which the interested party might bring with regard to the identity of the land; a copy of the certificate issued by the *alcalde* of Yauco upon the petition of the inspector of forests, to the effect that Vergés appeared on the land-tax list for the year 1866 to 1867, for 4 *caballerías* of land in the *barrio* of Vegas, not appearing on said list for such land either before or after said fiscal year; another report of the inspector of forests of April 14, 1885, to the effect that there is no way of executing the judgment, for the reason that the land seized in the name of the State does not comprise either the whole or any part of the Pinatell grant, the inspector believing that he should not give possession of the land, but only lay out again the lands granted to Pinatell at the cost of the successors in right of Vergés, in order that they may enforce against the occupants thereof the actions and rights which they may have, in the most suitable manner and form; which recommendation was accepted by the Contentious Council and the persons interested so advised; copies of a number of communications relating to the appointment of experts and the cost of the survey, and a copy of the letter made on December 7, 1885, which reads as follows: 'In the barrio of Las Rubias, jurisdiction of Yauco, on December 7, 1885, César de Guillermo, chief engineer of forests; Pedro Gabriel Carreras, the representative as attorney in fact of the Estate of Pedro Lázaro Vergés, and Lorenzo J. de Vizcarrondo, an expert appointed by the party to represent him in these proceedings, met for the purpose of preparing a plan of the lands referred to in the report of the Contentious-administrative Council of July 10, 1885, and the resolution of the Governor General of the 17th of the same month, rendered on the petition of Francisca Evelina Remond, widow of Pedro Lázaro Vergés, for the execution of a judgmenet of the Council of State, in testimony whereof they make this memorandum, which they sign the day, month and year above stated.—César de Guillermo, Pedro Gabriel Carreras, Lorenzo J. Vizcarrondo.' On the same day the said gentlemen made an inspection of the land and both experts agreed to begin the preparation of the plan from Almendrones Brook, which will be done to-morrow. They sign this statement. César de Guillermo, Pedro Gabriel Carreras, Lorenzo J. Vizcarrondo. On the 8th of the

same month, at the place indicated by the engineer and chief inspector of forests, with the concurrence of the expert of the party and with the attendance of his representative, they proceeded to take the data for the plan of Almendrones Brook, referred to in the title and measurement embodied therein, issued to Fernando María Pinatell in 1834. Said pass, which was inspected by all the gentlemen mentioned and by Simon Fraticelli and Francisco Pietri, was gone over beginning at its entrance on Río Chiquito, which is on the left bank of said river, a little below the house of Vicente Simonety, situated on the right bank of the river, along the bed of the river Almendrones, brook being followed up stream, leaving on the north the lands which the State had seized and sold to Fraticelli, Pietri and Tolinche, going in the direction and the distances stated in the memorandum book whose sheets are rubricated by both experts, the fissured rock where the said lands seized by the State being likewise fixed. Up stream from this point the bed of the river was left and point 16 was fixed on the left slope, south of the brook; thence to point 17, located on another slope to the north of the brook; thence to 18 on the same slope; thence to 19 crossing the brook, and therefore south thereof; and from this point to point 20, situated on Carrizales Ridge, above the opening to said Almendrones Brook; which point is situated 26 meters along the ridge from the corner of the house of Rafael Gomez, which is to the south of said point. From point 20 Carricales Ridge was followed and directions and distances fixed, to point 28, which is on the road to Yauco which here runs along the ridge. At this point work for the day was suspended, all of them signing in testimony hereof. (Statement of, corrections in original Spanish draft.) —César de Guillermo, Lorenzo J. de Vizcarrondo, Pedro Gabriel Carreras. The work was continued on the 9th of the same month, beginning from point 28, where it had been suspended the day before, points 29, 30, and 31 being fixed on the same ridge, with the data entered on the book with the same formalities as the day before; from point 31 point 32 was fixed at a cart on the slope down to the Chiquito River, on lands said to belong to Juan Victoriano Ferrer, which point was fixed as a point of reference from the river. In the line so far laid down the only one of the points cited in the title of Pinatell, which has been verified, is the outlet to Almendrones Brook in the Chiquito River, none of the others referred to in said title having been found, notwithstanding the fact that this is the section where the points mentioned in said title should be found on account of being trees, which must have disappeared;

the ridge was not followed any further because it was not considered that the lands further down were included in the said title. For the purpose of fixing the points on the ridge corresponding to the unclaimed lands sold by the State to Pietri, Fraticelli and Tolinche, distances were run from point 20, which had been fixed on said ridge the day before, above the entrance to Almendrones Brook, along which were fixed points 33, 34, and 35, the last point being 12 meters beyond the first point of the unclaimed land corresponding to Pietri; 36, 37 and 38, the last near the road leading to the 'Indiera' Estate, belonging to Bartolomey; 39, 40, this point on the land which separates Pietri from Fraticelli; 41, dividing that of Fraticelli and Tolinche; 42, 43, 44, 45, 46, 47, and 48, at the foot of an *aguacatillo,* which is the last point of the unclaimed land adjoining Tolinche. And going along the boundary between Yauco and Maricao, which is a ridge that serves as a boundary of the Tolinche Estate, there were fixed, in order to go down stream and fix the points therein of the unclaimed lands, the points marked with numbers 49, 50, 51, 52, 53, 54, 55, 56, and 57, from which point 58 was fixed at the foot of *yagrumo* on the left slope of the Chiquito River; that is to say the slope opposite the ridge surveyed; thence to point 59, which is on the right bank, and from this point to point 60 in the bed of the river; from which, going down stream, points 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, and 75, the last point being the first point of the river corresponding to the unclaimed land above referred to, of which the last is the outlet of Almendrones Brook in the Chiquito River, which was marked number one. From point 75, following the bed of the river, points 76 to 81 were fixed, where work for the day was suspended. There were present at the work on the first part of the ridge, Carlino Melini; and on the part of the ridge pertaining to the unclaimed land, Francisco Pietri and Stephano Tolinche, and César de Guillermo, Lorenzo J. Vizcarrondo and Pedro Gabriel Carreras sign in testimony thereof. On the 10th of the said month the said work was continued, beginning at point 81 in the Chiquito River, where it had been suspended yesterday, following the course of which the points were fixed, whose situation is set forth in the memorandum book, rubricated with the same formalities, and given numbers 82, 83, 84, and 85, at which point was fixed that marked number 1, which serves as the starting point and is located on the left bank of the river, on the right of the outlet of Almendrones Brook; which point is the last of the points along the river of the unclaimed land sold to Pietri, Fraticelli and Tolinche, referred to in the claim filed by

Pedro Lázaro Vergés. From this point (number 1), in order to locate the *guarguao* which appears as a starting point in the survey of the title of Pinatell on the bank of the Chiquito River, 40 *cuerdas* to the south of the outlet to Almendrones Brook, the course of said river which was followed, points 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, and 102 being fixed; at which point Rafael Gomez and Eugenio Rodriguez appeared asking what was the purpose of the work being done, and alleging that the lands comprised therein belonged to them and that they had acquired them legitimately. Upon the chief forestry engineer informing them of the purpose of the work, they stated that, although they had the fullest confidence in said engineer, they believed it their duty to protest against the said operation, which protest they would repeat wherever it might suit them; and upon being invited to come to the house and write their protest, they refused to do so. Continuing the operations, and always following the course of said Chiquito River, there were fixed in the neighborhood of its bed the points marked with the numbers from 103 to 116, both inclusive. Point 117 was fixed from point 115 and is situated on the left slope of said river, about 40 meters from its bed; 118 was fixed from 117, and is situated on the same slope. From this point, point 32 on said slope was sighted and which had been fixed from the Carrizales Ridge the day before; by which the work was concluded. There being also fixed from said point 118 the points which were marked 119 and 120, which are situated in the bed of the Chiquito River downstream from the previous points and also downstream from the point where it is supposed the *guaraguao* tree stood, fixed as the starting point of the survey included in the title of Fernando Maria Pinatell; by which the field operations were considered closed, said work having been done with the aid of a Trenghten transit, the graduation of which from north to west is divided into 400 degrees, its declination being thirty minutes east. During this work reference was had to a certificate issued by Joaquin Mayoral of the title of protection issued to Fernando Maria Pinatell in 1834, which the representative of the Estate of Pedro Lázaro Vergés produced and which, after all the sheets thereof had been rubricated in the upper part by both experts, was made a part of this record, subject to return, the record being signed in testimony thereof. (Statement of interlineations and corrections, etc., in original.)—César de Guillermo, Lorenzo J. Vizcarrondo, Pedro Gabriel Carreras. A true copy; Guillermo. Copy of the report of the inspector of forests, recommending that the petition of the widow of Vergés be dismissed,

with a reservation of her rights against the possessors of the lands of the grant in order that she may enforce them in the proper manner, in view of the resolution of the council to this effect; another certificate (folio 1125) issued by the said chief clerk of the central administration of taxes and revenues, comprising the first section of the record of the proceedings instituted as a consequence of a number of petitions submitted to the government by Pietri, Fraticelli, Vergés, and Tolinche, relating to the unclaimed lands of the State situated in the *barrio* of Las Aceitunas, jurisdiction of Yauco, in which is inserted a communication from the Governor General to the inspector of forests, accepting the recommendation of the latter and ordering the seizure of the lands denounced as unclaimed by Celestino Arizmendi and the institution of the proper proceedings; and stating that no punishment should be imposed upon the persons denounced by Arizmendi, as the violations which he alleged had been committed had not been proved and that the right of Arizmendi to claim in court the ownership of the lands which he bought from Felipe Ayala in the *barrio* of Las Rubias should be reserved.    There is inserted also the record of the seizure made on December 14, 1876, by Ramon Garcia, assistant forester, the acting *alcalde,* and secretary of the *ayuntamiento* of Yauco, the *comisario* of Las Rubias, and a number of witnesses, of 170 *cuerdas* the greater part thereof planted in coffee and bananas, the *comisario* of the *barrio* being entrusted with the custody thereof; also the record of the uses of such lands and the schedule of conditions for the public sale thereof prepared by the inspector of forests, and a communication from the latter to the Governor recommending its sale to the highest bidder; the petitions of Domingo Pietri and Simon Fraticelli for authority to cultivate and use said land, and also that they be granted the ownership thereof; the report of the inspector and the resolution of the Government granting said petitions; the record of the survey of May 7, 1877, of the land of each of the petitioners, with the plan at folio 1155; the communication from Pedro Lázaro Vergés, stating that the land sought to be sold belongs to him, without any action having been taken thereon owing to the documents presented by Vergés having been returned to him; a number of reports and antecedents relating to the proceedings prosecuted in San Germán between Pedro Lázaro Vergés and José Maria Rodriguez Arredondo opposing the grant to the latter of lands belonging to the former, closing with the recommendation of the inspector that the Government order the court of San Germán to abstain from taking cognizance of said proceedings, and that such of the lands seized be

awarded to the three gentlemen owning the adjoining property as
each had cultivated; another certificate (folio 1178) issued by the
aforementioned official relating to the proceedings by Felipe Ayala
requesting 400 *cuerdas* of land in the jurisdiction of Yauco, in which
are inserted: A certificate issued by the clerk and secretary of the
superior board of distribution of unclaimed lands, stating that Felipe
Ayala had not been granted any unclaimed lands in any judicial
district of the province; the judgment of the Ponce court dismissing
the complaint of Mompesart against Ayala, and the judgment of the
*Audiencia Territorial* affirming the judgment of the lower court; the
petition of Ayala praying for the grant of 400 *cuerdas* of un-
claimed lands in the *barrio* of Vegas, jurisdiction of Yauco, with
the report of the municipal council of Yauco, to the effect that ac-
cording to a number of residents that land is considered unclaimed
and although said to have belonged to Colonel Pinatell, the latter
had never planted it nor used it; a communication from Pedro
Lázaro Vergés opposing the petition of Ayala; the report of the
secretary of the board of unclaimed lands, to the effect that he was
in the office ready to lay the petition of Ayala before the board; the
report of the municipal council of Yauco, with data and documents
previously requested, to the effect that the lands requested by Ayala
were included in the deed of sale by Aubret to Mompesart, said
lands having been occupied by a number of individuals for more
than fifteen years, some or most of them having been purchased of
Ayala when they were still uncultivated; and a communication from
the board of unclaimed lands relating to the decision of the board
rejecting the petitions of Felipe Ayala and Silvestre Fraticelli for
the grant as unclaimed lands of part of the land which had been
granted to Fernando Pinatell; another certificate (folio 1197), is-
sued by the same official, including the petition of Pinatell for the
grant of 4 *caballerías* of Crown lands as unclaimed lands; the order
making the grant and the survey of said land on November 29, 1834,
by Commissioner Juan Troche and Surveyor Enrique Rodriguez
Feliciano; another certificate (folio 1201), issued by the said official,
in which is inserted the petition of Silvestre Fraticelli for the grant
of 400 *cuerdas* of unclaimed lands, and the favorable report of the
municipal council of Yauco; a certificate (folio 1206), issued by the
secretary of the contentious-administrative court, including the plan
(folio 1206) which had been sent him by this court, showing that this
plan agreed with the copy authenticated by the surveyor Armando
Morales, found at folio 14 of the record relating to the contentious-
administrative proceedings instituted by Pedro Lázaro Vergés against

the decision of the Governor General relating to the reversion to the State of unclaimed lands situated in Yauco, without the record showing that the *fiscal*, as the representative of the administration, had in any of his allegations attacked the authenticity of said plan; another certificate (folio 1207), issued by the secretary of the chamber of justice of the *audiencia territorial*, in the proceedings prosecuted by Pedro Mompesart against Felipe Ayala for an accounting, embodying the order of the Supreme Court reversing that of the *audiencia* and directing it to decide as to whether it would allow an appeal in cassation, transmitting the proper abstract of the record, with a citation and summons of the parties; and, upon the appeal being allowed, the proper abstract was sent to the Supreme Court without anything else with regard to said appeal appearing of record; another certificate issued by the *alcalde of Yauco* (folio 1212), to the effect that the land-tax lists for the years 1838, 1841, 1843, 1844, 1847, 1849, 1850, 1851, 1852, and 1854 show Fernando Maria Pinatell to have declared 800 *cuerdas* of land; that for the year 1855 shows Juan Aubret the same number of *cuerdas*; the lists for 1856, 1857, 1860, and 1861, Fernando Mompesart, also 800 *cuerdas* of land; and the tax lists for 1862, 1863, and 1865-66, Pedro Lázaro Vergés, with the same number of *cuerdas*, while Esteban Gallart does not appear on said lists; another certificate (folio 1213) issued by the secretary of the chamber of the *audiencia territorial* in view of the proceedings prosecuted in Ponce by Pedro Mompesart against Felipe Ayala for an accounting, including a communication from the *alcalde* (mayor) of Ponce to the commandant of the barracks at Yauco, for the examination of witnesses proposed as evidence by Mompesart, for the purpose of proving that Pinatell had held possession under a just title in good faith and without interruption from 1834 to 1853, when he sold his possession of 800 *cuerdas* of land in the district of Chiquito River, *barrio* of Vegas, of Yauco, a number of which witnesses had been entrusted with the care thereof and to secure the cultivation of the land by tenants; that Felipe Ayala, his brother Antonio, Rufino Ramos, Dionisio Aguilar and a number of others resided on part of said lands formerly possessed by Pinatell, having been placed there by Felipe Ayala, who could use the products only, remaining as tenant on the estate; that a plan and survey attached to the communication relate to the 800 *cuerdas* of land of Mompesart, the communication relating also to other matters, including the fact that Mompesart took possession of the land in August, 1854, living there until January, 1855, followed by the testimony of the witnesses, some of whom agreed with the interrogatory, and others denying, owing to the lack

of knowledge thereof; that Ayala had been on the lands as a tenant. The certificate included also a petition from Solicitor Juan Aubret to the Ponce court of August 10, 1854, for the survey of a farm in the district of Chiquito River, *barrio* of Las Vegas, in Yauco, of 800 *cuerdas* of land in order to establish the real boundaries of said estate; the order of the 11th of said month granting the petition for the survey and commissioning Surveyor Pedro Lázaro Vergés to make it; the record of such survey, signed by him alone, which he states he made with the knowledge of the local judge and the attendance of the *comisario* of the *barrio*, describing the boundaries in the following manner: The starting point was a live *guaraguao* tree indicated on the plan of said lands which is attached to this statement for the sake of clearness, the dividing point given by Juan Antonio Montes, the present adjoining owner on the south side, with lands which formerly belonged to Basilio and Diego de Torres; this point is situated on the bank of the Chiquito River opposite a live laurel tree situated on the bank opposite that on which the *guaraguao* tree is located, which is on the western bank of said river, marked letter 'A' in this plan; from this point a straight line was drawn in a northerly direction 40½ degrees east, which forms the boundary with the land of the said Montes and following it for 1,048 Spanish *burgos varas*; the second point on the same boundary was reached, being fixed at a dead *aguacatillo* stump having a rose apple tree at its foot, situated on the western edge of the Carrizales highway running from Yauco to Lares, which point is marked 'B' on the plan adjoining the lands which Montes acquired of the Torres and others on the east, and the lands which Santos Semidey acquired of Felix Mattei. From this point the western edge of said road was followed in a northeasterly direction, leaving on the east the said lands of Semidey, and mersuring 369 yards along the sinuous line described, the top of Guayabales Ridge was reached which forms the boundary between Yauco and San Germán, to a stake 'C,' which was placed on the eastern edge of the road referred to, at which point the lands of Semidey end and those belonging to Silvestre Fraticelli, situated to the east of the road, which separates them from the lands the subject of the survey. From this stake, continuing along the western edge of the said road leading to Lares, running along the continuation of the ridge dividing the judicial districts mentioned, leaving the lands of said Fraticelli on the other side, the sinuous line described was followed towards the northeast, and after continuing it for 1,029 yards, a *mauricio* tree 'D' was reached, at which point the lands of the latter end and those of

Juan Bautista Plumet begin, also situated to the east of said road, which was followed in the same direction for 624.25 *varas* to the junction 'E' of this road with the local road leading to the district of Quebrada Bonita. At the junction the main road leading to Lares was left and the other road, also built on the ridge which divides the two districts mentioned and running in a northeasterly direction, was followed along its tortuous course leaving the lands of said Plumet on the other side, for 592.75 yards to a *ciralillo,* or wild *cacao,* tree at the junction 'F' of said road to Quebrada Bonita, with the so-called Aceitunas Road, where the property of Plumet ends and lands of the estate of José Maria Pacheco follow. Leaving the former road to continue along the Aceitunas Road, which is also laid along the continuation of the dividing ridge which also runs here in a northeasterly direction and then turns to the southeast, the sinuous line formed by said road was followed leaving on the opposite side; that is to say, to the north, the said lands of the Estate of Pacheco, and a computation of the length in the various directions gave a total of 1,673.75 *varas* to a *mato* or carob tree marked on its trunk with a cross, a point indicated by the letter 'B' in this plan as a point of division from the lands of Antonio Cabasa, a resident of Cabo Rojo, represented by Pedro Santoni, who indicated the boundaries, said *mato* tree being situated on the eastern edge of the said Aceitunas Road. From the latter point and boundary with the lands of the said Cabasa which were left to the west, a straight line was drawn in a southerly direction 5.5° east, 626 *varas* in length, to the afore-mentioned Chiquito River to a small *capá* tree close to two *sierra* palms in the middle of said river opposite the mouth of a small dry creek, which starts from the west, designated by the letter 'H' in this plan, and a dividing point from the said lands of Antonio Cabasa. Thence the sinuous course of the waters of the river was followed down stream towards the south along the left bank, and measuring along the tortuous line described 1,873.75 *varas* the outlet 'Y' in said river of the so-called Almendrones Brook was reached. Continuing down stream and following its turns 2,607.75 *varas* the *guaraguao* tree 'A' was reached, which was the starting point; concluding the survey which gave an area of 805.19 *cuerdas.* The final pleadings of the representative of Mompesart in said proceedings summarizing and alleging to be proved: That Pinatell was the exclusive owner of the 800 cuerdas of land now belonging to Mompesart; that the part on which Ayala and his tenants are located on the land adjoining that of Juan Antonio Montes, the successor of Diego Torres, is included within said 800 *cuerdas,* having the same

boundaries designated in the plan; that Pinatell had sold to no one
but Gallart, the latter to Aubret, and Aubret to my client; that
Rodríguez, not having nor having had any lands in the district of
Chiquito River and the *barrio* of Las Vegas, as he testified at folio
117, it is clear that he could not have sold anything there to Ayala;
that, further, he has not produced any titles in support of his claim
nor the titles to the land which he claimed to have bought of Sabater;
that the only ones acquired were the 400 *cuerdas,* one-half bought
of Torres in 1845 and the other half of Cabasa in 1854; that it is
likewise proved that Mompesart left Ayala on the farm under the
verbal contract mentioned in his complaint; that Ayala did not
consider himself the owner thereof, as evidenced by the fact that he
petitioned the Government to grant him the lands; that, losing hope
and finding himself obliged to return the Estate or be ejected there-
from, he purchased the possession of Cabasa in order to withdraw;
that if the purchase of 400 *cuerdas* from Rodríguez and Sabater
were true, Ayala would appear on the tax lists as paying taxes on 800
*cuerdas* with the 400 purchased of Ferrer and Cabasa, while it was
not until 1838 that he began to appear as the owner of 24 *cuerdas*
only and of 2½ more in 1840; that, consequently, it is not true that
he had possessed 400 *cuerdas* for more than twenty years, as his wit-
nesses had stated; finally, it is proved that his evidence is valueless
in these proceedings on account of the adverse party not having been
summoned, and, furthermore, it must succumb before the public docu-
ments attested by the *alcalde* of Yauco produced by Mompesart, and
the tremendous weight of the other evidence presented by the latter.
Never, therefore, have the courts been called on to settle a matter so
clear in which the data are so favorable to the justice of the claim of
Mompesart; another  certificate (folio 1257) issued by the record
clerk of the Ponce court, in view of the proceedings upon the inquiry
into the insolvency of Felipe Ayala, including the statement of the
latter to the effect that he has no property of any kind with which
to defray the indispensable expenses of his litigation with Mompesart,
because the property he did have had been interdicted by the said
Mompesart and he could not dispose thereof; the testimony of wit-
nesses corroborating this statement, and the order of the court di-
recting that Mompesart be heard. The expert evidence submitted
was heard, the experts testifying (folio 1068) that on September 16th,
upon the conclusion of the work relating to the evidence of August,
they did the work having reference to the plaintiff, and to this end
began by going over the Chiquito River from the outlet to Almen-
drones Brook down stream, by this means establishing the correctness

of the plan made by the inspector of forests, concluding the work for that day; that on the following day measurements were continued in an easterly direction from a point marked by a stake by which the 20 *cuerdas* establishing one of the boundaries of the Pinatell grant had been marked the day before, and as it was not possible to conclude the work this day a point was fixed at the foot of a *guaraguao* on lands belonging to Pietri, which were the only ones crossed in this work; that this point was 236 meters and 50 centimeters towards the east from the outlet to Almendrones Brook in the Chiquito River; that it not having been possible for them to devote more time to the work they suspended it without their being able to express an opinion on any of the points involved in the evidence, and to state only that the lands, the subject of the Pinatell grant, must be those comprised within a rectangle which, having one of its vertexes at the outlet to Almendrones Brook in the Chiquito River, permits of the survey of the land from this fixed and natural point in the following manner: Measuring from this point 20 *cuerdas* in an easterly direction, one vertex of the rectangle will be determined; measuring 40 *cuerdas* in a southerly direction from this rectangle another vertex will be established; measuring from the latter 20 *cuerdas* to the west the third vertex will be fixed; then measuring 40 *cuerdas* to the north the first vertex situated at the outlet of Almendrones Brook in the Chiquito River should be met, thus closing the rectangle; and, finally, Santiago Galarza testified as a witness (folio 1103), to the effect that in 1855 he was present at the survey of 800 *cuerdas* of land in the *barrio* of Vegas, district of Rio Chiquito, jurisdiction of Yauco, by Surveyor Vergés, with the attendance of the commissioner of the *barrio* and the owners of the adjoining property, and that the estates of Pietri and Agostini are included within said land, not knowing to whom the Estate of 800 *cuerdas* belongs, but knowing that Felipe Ayala occupied a house thereon built by Pedro Mompesart. On cross-examination he stated that he did not know the meaning of the word survey; and José Maria Rodríguez stated (folio 1269, reverse side) that it is true that the 200 *cuerdas* which he indicated in Las Vegas, believing them to be unclaimed, he became convinced later formed part of the 800 *cuerdas* granted to Pinatell, discontinuing the proceedings instituted in San Germán, and that the estates of Francisco and Domingo Pietri are included within the said 800 *cuerdas*.

"22. The evidence of the defendants consisted of documents, comparisons thereof, and expert evidence, as follows: There were submitted a certificate (folio 1396) issued by the registrar, comprising

the record of the 'Gloria' estate in favor of Fraticelli brothers, acquired subject to the charges set forth in said record of possession; a copy (folio 1402) of the instrument of the division of the property of Silvestre Fraticelli, Teodora Pietri, and the latter's son named Agustín, executed by their heirs before the notary of Yauco on August 4, 1879, such property including a number of *cuerdas* of land with the special names of the tracts to which they belong; copy of a deed (folio 1418), executed in Yauco, on April 19, 1876, by Felipe Ayala, of the sale to Mariano Bartolomey of 100 *cuerdas* of land in the *barrio* of Rubias, jurisdiction of Yauco, purchased from Cabasa & Co. by deed of October 30, 1854, the sale being made for 400 *pesos* received; another copy (folio 1422) of a deed executed in Yauco on ――― 4, 1869, by Alejandro Bartolomey, as the attorney in fact of Mariano Bartolomey and Ana Maria Fraticelli, of sale and assignment to Luis Felipe, Pablo Simon and Alejandro Fraticelli, of one-half of the coffee plantation called 'Emilia,' of 170 *cuerdas* of land, situated in the *barrio* of Rubias, jurisdiction of Yauco; a copy (folio 1456) of a deed of sale executed in Mayagüez on July 29, 1876, by Mariano Bartolomey to Silvestre Fraticelli of 100 *cuerdas* of land which he had acquired from Felipe Ayala, situated in the *barrio* of Rubias, in the municipal district of Yauco, for the sum of 500 *pesos* received; a copy (folio 1488) of a deed of sale executed in Yauco on October 30, 1854, by Lluch y Amill, as the attorney in fact of Cabasa & Co., to Felipe Ayala, of 200 *cuerdas* of land in the *barrio* of Rancheras, district of Frío, municipality of Yauco, which the owners thereof had acquired by purchase from Francisco Diaz Resino, the sale being effected for 500 *pesos* payable in instalments, the title issued by the board of distribution of unclaimed lands, on February 12, 1849, granting the said 200 *cuerdas* to Francisco Diaz Resino, being inserted therein; a copy (folio 1500) of a deed executed on September 4, 1882, by the firm of Fraticelli Brothers, involving the sale to Vicente Limarola y Benigni of the coffee plantation called 'Gloria,' aforementioned, consisting of 260 *cuerdas,* situated in the *barrio* of Rubias, jurisdiction of Yauco, the consideration of the sale having been 38,262.34 *pesos;* a copy (folio 1514) of the deed of sale executed in Yauco on July 28, 1853, by Felipe Ayala to Santiago Ruiz, of 50 *cuerdas* of land in the *barrio* of Vega, jurisdiction of Yauco, which he had acquired by purchase from several different persons, the sale being made for 75 *pesos* received; another copy (folio 1523) of a deed of sale executed in Cabo Rojo on June 12, 1849, by Francisco Diaz, to Cabasa, Vignals & Co., of 200 *cuerdas* of land in the *barrio* of Frailes, district of Rancheras, place known as

Frío, jurisdiction of Yauco, which he had acquired by grant from the board of unclaimed lands, dated·February 12th of said year, the sale being made for the sum of 200 *pesos* received; copies of the deeds of which unauthenticated copies are presented by Francisco Lluch Negroni, involving the sale of lands by Santiago Vivaldi to José Gregorio Ramos, by the latter to Rafael Gomez Diaz, and by the latter to Francisco Lluch Negroni (folios 1947, 1954, 1970, and 1978); a copy (folio 1962) of the deed of sale executed in Yauco on December 22, 1890, by Francisco Lluch Negroni to Francisco Pietri of 20 *cuerdas* of land which he had acquired from Rafael Gomez Diaz, the sale being made for 1,000 *pesos* received; folio 2054 was compared with the original deed· of sale executed by Eugenio Rodríguez in favor of Domingo and Francisco Pietri on May 31, 1886; folio 1556 was compared with the copy of the ·deed submitted by the representative of Domingo Pietri involving the sale to him by César de Guillermo on October 13, 1877; folio 1567 was likewise compared with the copies of· deeds presented by said Pietri, executed by Felipe Ayala to Rufino Ramos on March 7, 1856; that executed by Felipe Ayala to Rufino Ramos on May 14, 1862; that executed by Ramos to Domingo and Pablo Francisco Pietri on April 28, 1871; that executed by Felipe Ayala to Juan Bautista Montaggioni on June 28, 1867; that executed by Ayala to Gregorio Santiago on February 15, 1867; that executed by Andrés Agostini to Juan Cedeño on December 5, 1876; that executed by Cedeño to the Pietri brothers on May 28, 1884; that executed by Ramon Camacho to Domingo Pietri on May 7, 1885; that executed by Francisco Lluch to Domingo Pietri on December 22, 1890; that executed on January 13, 1890, by Rafael Gomez to Francisco Lluch Negroni; all of said copies being found to agree with their originals. A comparison was also made with the originals (folio 1540, reverse side) of the certificates issued by the assistant inspector of forests and the plan submitted by Agostini, now appearing at folios 1527 to 1537, which were found to be substantially correct. A certificate was submitted (folio 1574), issued by the secretary of the chamber of the *audiencia,* relating to the proceedings instituted by Pedro Mompesart against Felipe Ayala for an accounting of the lease of the lands, the testimony of Juan Aubret being inserted therein, in which he stated that he had possessed the land for one year and fifteen months, but without knowing the area or character thereof, as he had never seen it, and that he had accepted the simulated deed of purchase as a favor to the conveyor and Pedro Lázaro Vergés, who requested him to do so and without the land having been measured; the testimony of Esteban Gallart, to the effect

that he never even had seen the land and that the acquisition had been made for the account of and for Pedro Lázaro Vergés, and that he did not know whether the land was cultivated or not when he acquired it and he sold it to Juan Aubret; the testimony of Fernando Maria Pinatell, to the effect that he did not know whether the land had been cleared, planted and opened, because if any of it were in such state the work had been done by trespassers; that he had no manager on the estate and had placed Enrique Rodríguez Feliciano thereon to watch it only; the judgments of the upper and the lower court in said proceedings, and the petition of the representative of Mompesart for an extension of the period for the appeal in cassation owing to the death of Mompesart, which extension was denied by superior order of January 5, 1860; a certificate (folio 1591) issued by the chief clerk of the central administration of taxes and revenues, to the effect that the record of the survey and appraisal of the unclaimed lands in Aceitunas in Yauco, and the survey and appraisal for the sale of 58 *cuerdas* of Domingo Pietri show that the sale was made for 9,464.36 *pesetas* paid in a number of instalments, the last one being paid to the collector of Guayanilla on September 2, 1878; another certificate (folio 1990) issued by the secretary of the chamber of the *audiencia territorial* including a number of the documents contained in the record of the proceedings prosecuted by Mompesart against Ayala and relating to petitions therein; the testimony of witnesses and the final pleadings of the representative of Ayala; the testimony of experts was heard upon the petition of Pedro Angel Agostini, the experts testifying (folio 1896) that with the data which they took from the record and the plans showed them by counsel for the plaintiff, they first surveyed the lands on which they were taking as a basis the outlet to Almendrones Brook, and from this outlet they went along the banks of the Chiquito River upstream to a point dividing the lands of Simon Fraticelli and Angel Pedro Agostini, the exact situation of the points on the plan made by inspector of forests César de Guillermo being verified at the same time; that the brook having been followed from a point near its source to its outlet in the Chiquito River, a stop was made with the apparatus and a sight taken due east, a mark being placed in this direction and 50 meters measured off with the chain and a stake being placed at this point. For these reasons they are of the opinion that the lands of the Pinatell grant do not lie to the north of an open line drawn to the east, and the brook being due north of this line it is clear that the lands situated to the north of the brook must be beyond

the lands of the Pinatell grant, and that, consequently, the lands of Angel Pedro Agostini are not within the same.

"23. The witnesses presented by the defendant Agostini were heard: Ramón Camacho (folio 1611), Ramón Velez Cintrón (folio 1614), Mateo Vélez Cintrón (folio 1617), Prudencia Matos Santiago (folio 1620, reverse side) stating that they knew by hearsay of the grant of 200 *cuerdas* of land by the board of unclaimed lands to Francisco Diaz Resino on February 12, 1849, and that they knew of their own knowledge that in June, 1849, Diaz Resino had sold these 200 *cuerdas* to Cabasa, Vignals & Co., who entered upon the possession thereof as owners and held it until the month of October, 1854, when they sold it to Felipe Ayala; and the latter entered upon quiet and peaceful possession thereof as owner, without interruption until 1858, when he sold 100 *cuerdas* by private document to Mariano Bartolomey, who likewise entered on the possession thereof, cultivating and enjoying the usufruct thereof until 1865, when he sold to Silvestre Fraticelli. The latter held quiet and uninterrupted possession of these hundred *cuerdas* until his death in 1861, when his successors continued in this peaceful possession until 1879, when the division and adjudication among the heirs took place. Witnesses Gregoria Santiago y Rodríguez (folio 1624, reverse side), Manuel Torres Casiano (folio 1627), and Manuel Maria Ruiz (folio 1629, reverse side) stated: That Mariano Bartolomey had been the owner since prior to 1860 of an estate called 'Emilia,' situated in the *barrio* of Vegas, consisting of 300 *cuerdas,* which he had purchased from Felipe Ayala; that Bartolomey and Silvestre Fraticelli entered into a contract of partnership under the style of Fraticelli & Bartolomey in 1860, Bartolomey conveying to Fraticelli one-half of the 'Emilia' plantation. This partnership was dissolved upon the death of Fraticelli, one-half of the plantation being awarded to the estate of the latter and the other half to Bartolomey, after the survey of the estate which showed it to have an area of 160 *cuerdas,* which were held in possession by the firm of Fraticelli & Bartolomey from a date prior to 1860 until 1871, when the partnership was dissolved. Witnesses Ramón Cruz Quiñones (folio 1633, reverse side) and Esteban Tolinche y Mofí (folio 1636, reverse side) testified that they knew of their own knowledge that in 1873 the heirs of Silvestre Fraticelli and his wife, Teresa Pietri, and son Agustin, made a division of the estate, 22.50 *cuerdas* being awarded to each of the heirs, making a total of 180 *cuerdas,* eighty proceeding from the firm of Fraticelli & Bartolomey and the hundred from a purchase by the deceased Silvestre from Bartolomey in 1875; that said Bartolomey in August, 1879, sold to·

Fraticelli Brothers the 80 *cuerdas* of the 'Emilia' plantation which had been awarded him upon the dissolution of the firm of Fraticelli & Bartolomey, which firm of Fraticelli Brothers, or the members composing it, purchased from their brothers, in August, 1879, the 90 *cuerdas* of land which they had inherited from their parents and the 12.86 *cuerdas* which they had inherited from their deceased brother Agustín, becoming the owners of the entire 260 *cuerdas*, which they sold to Vicente Limarola in 1882; that in March, 1890, Limarola sold the said 260 *cuerdas* to Angel Pedro Agostini, and that the latter as well as the former owners had possessed the lands quietly and peacefully, without interruption on the part of any one, cultivating them and enjoying the usufruct thereof, as sole and exclusive owners.

"24. The witnesses presented by Domingo Pietri and Francisco Cedeño were heard; witnesses Manuel Cintrón y Lugo (folio 1723), Ramon Velez y Cintrón (folio 1728, reverse side), Francisco Quiñones y Santiago (folio 1735), Prudencio Matos y Santiago (folio 1740), and Ramon Camacho y Montes, testifying that they knew that Felipe Ayala had possessed 160 *cuerdas* which he purchased from Enrique Rodríguez Feliciano, cultivating them as the owner at his own expense, planting thereon coffee, bananas, and other minor fruits; that Ayala sold 60 *cuerdas* with some coffee and banana plantations in the *barrio* of Vegas, to Rufino Ramos, in 1856, the land being the same which is mentioned in the deed of March 14, 1862 (folio 320), Ramos selling the two tracts consisting of 160 *cuerdas* to Domingo and Francisco Pietri on April 28, 1871, being the same lands described in the deed at folio 324, the possession of Pietri having been quiet and peaceful and uninterrupted, as had that of the previous owners, the Pietri brothers, in addition to cultivating the lands, having built a dwelling and storehouse thereon, a coffee-drying terrace, and other things necessary for the preparation of coffee. Witness Camacho y Montes stated that he knew by heresay that Agustín Sabater and Enrique Rodríguez Feliciano had possessed lands in the *barrios* of Vegas and Rubias in the year 1834, and that they had sold 60 *cuerdas* to Felipe Ayala; that Rodríguez Feliciano had sold another hundred *cuerdas* of land to said Ayala, the last sales not being known to the other witnesses, who stated that they knew only of the possession of land by Ayala, without knowing the origin or form of acquisition thereof; witnesses Lorenzo Cruz Rivera (folio 1752), Agustín Ayala y Rivera (folio 1755, reverse side), and Ramon Cruz y Quiñones (folio 1759) testified that they knew that since the year 1834 Felipe Ayala had been the owner of lands in the *barrio* of Rubias, jurisdiction of Yauco, selling 5 *cuerdas* to Rufino Ramos in 1862 which

Ramos sold in 1864 to Anastacio Cruz, and the latter, in 1876, to the brothers Domingo and Francisco Pietri, who, like the previous owners thereof, held public and peaceful possession of the same without interruption whatsoever, planting them in coffee and bananas and cultivating them as absolute owners. Witnesses Ramon Rodríguez y Rodríguez (folio 1736, reverse side), Manuel Maria Rios Vélez (folio 1767), and Felipe Morales y Vargas (folio 1771, reverse side). The first two named stated that as children they saw Felipe Ayala in possession of lands in the *barrio* of Rubias, jurisdiction of Yauco, having sold 15 *cuerdas* to Rufino Ramos in 1859, which Ramos sold in 1866 to Antonio Ramos, and the latter to the brothers Domingo and Francisco Pietri, in 1876; all of them holding quiet and public possession as owners, without any interruption whatsoever, cultivating the land, which they planted in coffee and other products. These facts of possession were corroborated by the other witness Morales, who, however, did not determine the number of *cuerdas* nor the dates of the purchases. Witnesses Benero Negrón y Patron (folio 1780, reverse side), José Montalvo y Lugo (folio 1784), and Manuel Quiñones Santiago (folio 1787, reverse side) deposed that they knew by hearsay that Felipe Ayala possessed a tract of land in the *barrio* of Rubias in Yauco, in the year 1834, as owner, selling 12 *cuerdas* to Leon Avilés, and of their own knowledge that Avilés sold this land in 1882 to Ramón Camacho, who recorded it in the registry, selling it subsequently, in 1885, to Domingo and Francisco Pietri, who, like the former vendors, possessed them peacefully and publicly as owners, without any interruption whatsoever, cultivating them and enjoying their usufruct, and planting them in coffee, bananas, and other minor products; witnesses Simón Fraticelli (folio 1775, reverse side, and 1873, reverse side), Esteban Tolinche y Morfi (folio 1878, reverse side), and Juan Bautista Rodríguez y Velez (folio 1884, reverse side) testified that Felipe Ayala possessed lands in the *barrio* of Las Rubias of Yauco, and in 1867 sold 50 *cuerdas* to Juan Bautista Montaggioni, who conveyed them by private document to Andres Agostini in April, 1873, Agostini selling them to Juan Cedeño in 1876, the latter to the brothers Pietri on March 28, 1884, said land being the same which is referred to in the documents and deeds of conveyance which were read to them, and Pietri brothers and the previous vendors had possessed the land quietly, publicly and peacefully, without any interruption whatsoever, cultivating and improving it as sole owners; witnesses Ramon Rodríguez Velez (folio 1792), Marcos Rodríguez Almodovar (folio 1795), and Antonio Lugo Velasco (folio 1798) stated in their respective depositions that it was true and they knew of their

own knowledge that Manuel Olivieri had been the owner of 130 *cuerdas* of land in the *barrio* of Rubias since the year 1859, selling 30 *cuerdas* to Eugenio Rodríguez on May 17, 1872, which 30 *cuerdas* Rodríguez sold to the Pietri brothers in 1884, who, like the previous owners, possessed the land quietly, peacefully and publicly without interruption whatever, planting the land in coffee, bananas, and other minor products, enjoying the usufruct thereof as exclusive owners and paying taxes on the land to the State and the municipality; witnesses Manuel Rio y Velez (folio 1891, reverse side), Manuel Torres Casiano (folio 1895, reverse side), and Agustín Ayala y Rivera (folio 1900, reverse side) testified that Ayala possesseed lands in the *barrio* of Vegas, in Yauco, selling 10 *cuerdas* to Gregorio Santiago in 1867, and 15 *cuerdas* to Santiago Ruiz in July, 1853, the latter selling 8 *cuerdas* to Gregorio Santiago in 1867; that Santiago sold these 18 *cuerdas* in November, 1881, to Santiago Chiramboti, who sold them in January, 1885, to Rafael Gomez Diaz, who sold them to the Pietri brothers on December 23, 1890, this land being the same referred to in the deeds of conveyance at folio 385, which were read to them, and that the Pietri brothers, as well as the former vendors, had possessed the land quietly and peacefully, without any interruption whatsoever, cultivating it and enjoying the usufruct thereof in their own names as sole and exclusive owners; witnesses Ramon Cruz Quiñones (folio 1083, reverse side) and Domingo Rodríguez Ruiz (folio 1807, reverse side) state that they know of their own knowledge that Felipe Ayala was the owner of lands in the *barrio* of Rubias, jurisdiction of Yauco, since the year 1834, selling 25 *cuerdas* in 1856 to Rufino Ramos, who conveyed them in 1862 to Anastacio Cruz, the latter selling them in 1876 to Rafael Gomez Diaz, and the latter, on December 23, 1890, to the Pietri brothers, who, like its previous owners, possessed said land quietly, peacefully and publicly, without any interruption whatsoever, cultivating it and enjoying the usufruct thereof as absolute and exclusive owners; witnesses Monserrate Pacheco y Perez (folio 1812), José Julian Vélez y Cintrón (folio 1816, reverse side), and Mateo Vélez Cintrón (folio 1820, reverse side) respectively stated in their testimony that they knew of their own knowledge that in the year 1834 Felipe Ayala was the owner and possessor of a tract of land in the *barrio* of Rubias of Yauco, selling 32.25 *cuerdas* thereof in 1843 to Sebastian Ramos, who, in 1859, conveyed 25.25 *cuerdas* to Maria Marina Rosario y Perez, and the remaining 7 *cuerdas* to Andrés Avilés y Ramos in the same year 1859; that Maria Marina Rosario y Perez and Avilés sold said land in 1869 to Rafael Gomez Diaz, who sold it on December 23, 1890, to the Pietri brothers, who the same

as the previous vendors possessed the land quietly, peacefully and publicly, without any interruption whatsoever, planting it in coffee, bananas, and other minor products and enjoying the usufruct thereof as sole and exclusive owners; witness Pedro Camacho (folio 1830) testified that he knew of his own knowledge that since the year 1862 Juan Cedeño y Caraballo had possessed 12 *cuerdas* of land in the *barrio* of Rubias, jurisdiction of Yauco; Asunción Montes y Sanchez, 4 *cuerdas;* José Ramon Vega, 2.5 *cuerdas;* Monserrate Ayala y Cruz, 2 *cuerdas;* and Isidro Cruz y Mercado, 2 *cuerdas;* which lands they had planted in coffee and minor products, selling them in 1877 to Francisco Cedeño y Ayala, who sold these 22.5 *cuerdas* of land to Domingo Pietri on June 7, 1893, Pietri, as well as the former owners, possessing it quietly, peacefully and publicly, without any interruption whatsoever, cultivating it and enjoying the usufruct thereof as sole and absolute owners; and witnesses Monserrate Pacheco (folio 1834, reverse side), Mateo Vélez Cintrón (folio 1836, reverse side), and Gregorio Santiago y Rodríguez (folio 1839, reverse side), respectively stated in their testimony that they had continuously resided in the *barrio* of Rubias and Vegas, of Yauco, since 1834, and were perfectly acquainted with the residents and possessors of lands in those *barrios;* knowing, therefore, of their own knowledge that Fernando Maria Pinatell, Esteban Gallart, Juan Aubret, Pedro Mompesart and Pedro Lázaro had never possessed nor cultivated any lands located in the *barrio* of Rubias, nor in that of Las Vegas, either in 1835 or in any subsequent year.

"25. Upon the expiration of the period for taking evidence, the sections containing the evidence introduced by both parties were attached to the record.

"26. The plaintiffs, through their solicitor (folio 2069) stated that they had settled the matter in litigation with Angel Pedro Agostini out of court, dismissing therefore the action in so far as said gentleman was concerned; whereupon the court ordered that the plaintiffs should ratify their discontinuance, without this having as yet been done.

"27. The record having been delivered to the plaintiff for the submission of final pleadings, he returned it raising an incidental question alleging the nullity of the proceedings had in the Municipal Court of Yauco and the incidental issue having been heard, judgment was rendered dismissing the same, and an appeal from this judgment having been taken, the appellant did not enter an appearance, and the appeal was declared abandoned (folios 2059 to 2122).

"28. The parties made their final pleadings, accordings to their

briefs which appear at folios 2144 and 2192, making the arguments which they deemed proper, the plaintiff, however, abstaining from the part relating to Angel Pedro Agostini on the ground that the proceedings against him had been discontinued by virtue of the abandonment thereof during these proceedings.

"29. In the prosecution of these procedings the provisions of law have been observed.

"1. Actions for recovery can be brought only by persons who believe themselves to be the owners of the thing or real property sought to be recovered, and this ownership must be authentically established, and especially the identity of what it is sought to recover, according to decisions of the Supreme Court of March 3, 1865.

"2. The means of identifying real property must conform to the means of proof authorized by the Law of Procedure when the existence of such identity is denied, in the first place being the evidence of experts, corroborated by data and antecedents carrying to the mind of the judge a full conviction of the veracity or honest opinion of the experts.

"3. The burden of proof of the ownership of the thing sought to be recovered is on the person bringing the action for recovery, according to judgments of the Supreme Court of December 27, 1865, February 20, 1866, and November 23, 1865.

"4. One of the requisites of an action for recovery is the establishment of the identity of the thing sought to be recovered, according to a decision of December 7, 1866.

"5. It is sufficient for the defendant to have possession, and the plaintiff is obliged to prove the right of action to recover, according to the judgment of February 20, 1866.

"6. In order to bring an action to recover the ownership of real property, it is necessary that the property involved be determined beyond any doubt, and that it be proved that the estate claimed is the same whose ownership is alleged.   (Law 25, title 2, *partida* 3.)

"7. As this litigation involves the exercise of actions for recovery, the decision rendered therein must rest principally on the efficiency and legal validity of the titles submitted by the plaintiff and defendant in support of their right to the thing in litigation.

"8. The title on which is based the action brought by the party plaintiff, the efficiency of which is to be considered in this judgment as against the titles presented by the defendants, is none other than the grant of 8 *caballerías* of land to Fernando Maria Pinatell by the superior board of unclaimed lands of this Island on December 4, 1834, without it being permissible to admit as a basis of the right of the

party plaintiff and with reference to the description of the lands granted, the deeds of the conveyance thereof to Gallart, Aubret and Mompesart, inasmuch as they contain notable differences in the metes and bounds from those set forth in the original grant, which are not fully corroborated.

"9. This grant to Pinatell of 4 *caballerías* of land in the *barrio* of Las Vegas, equivalent to 8 *cuerdas,* is of a rectangular form, as the title itself described it as included within four lines of 40 and 20 *cuerdas* in length, respectively, with the determination of the cardinal point where each of said lines falls, one of the vertexes of the said rectangle being the outlet of Almendrones Brook into the Chiquito River.

"10. Neither in the complaint nor in any of the other pleadings has the plaintiff specified with the proper exactness and precision the real situation and description of the lands sought to be recovered as included in the Pinatell concession, nor has said party established during the probatory term by means of the proper expert evidence that the lands described by her in the form of a polygon are the lands granted to Pinatell; therefore, the indentity of the thing, which is the corner-stone of proceedings like these in which actions for recovery are exercised, is lacking.

"11. Neither the decree-judgment of the Council of State in the litigation between Pedro Lázaro Vergés and the Administration, relating to the reversion to the State of the lands granted to Fernando Maria Pinatell, nor the other documents and evidence submitted by the party plaintiff produce the proof necessary in law to establish the identity of the lands sought to be recovered. This is confirmed and shown by the decision of the contentious council upon the petition for the execution of said decree-judgment with regard to the possession of the lands, denying the petition on the ground that the question of the identity had not been settled by the documents and plans presented, above which stood the title of the original grant in which the four points of the survey were established; and it would have been natural to have mentioned the Aceitunas and Carrizales ridges if they had constituted the boundaries of the Pinatell grant.

"12. In opposition to the title of the plaintiff, the defendants have presented public and formal documents by virtue of which they possess the lands sought to be recovered, recorded in the registry of property, which documents cannot be considered null nor, much less of no force because no evidence has been presented to establish such defect of nullity; as, on the other hand, the only ground for

nullity alleged by the plaintiff is that the lands comprised in these titles belonged to said party under another title of greater force and efficiency, such ground is destroyed by the lack of proof of the identity ot the lands.

"13. The exception of prescription having been alleged by the defendants, to be considered in the event that the exception of *sine actione agis* were not sustained, and as the latter is sustained, there is no necessity of discussing said prescription and the evidence in support thereof introduced in the proceedings, remaining subject to such discussion subsequently if the identity of the lands sought to be recovered is established.

"14. A decision on the cross-complaint filed by Domingo Pietri does not lie either, because being based on the allegation that the record of the titles of the party plaintiff is null, on account of the state being recorded in the name of a different person, such circumstance is not proved in any manner, by reason of the want of identity referred to.

"15. With regard to the defendant Agostini, consideration must be given not only to the voluntary withdrawal made in the proceedings by the representative of the plaintiffs, although such act was not duly ratified personally by the plaintiffs themselves, but also the favorable results appearing from the record of the survey and the plan made by the inspector of forests of this Island, with the concurrence of a representative of the party plaintiff in January, 1886, and of the expert work of identification in these proceedings, inasmuch as both documents state that the lands possessed by Agostini cannot form part of those granted to Pinatell, because the 'former are situated to the north of Almendrones Brook, while the latter should be to the south of said brook.

"16. In view of the foregoing considerations the exception alleged of *sine actione agis* should be considered proved, and, consequently, judgment rendered in favor of the defendants.

"17. The action brought not having been established the party plaintiff must be held to have proceeded without proper justification.

"In view of the legal provisions cited I adjudge that, sustaining the exception of *sine actione agis* alleged by the defendants, judgment should be rendered, and is rendered, in favor of Domingo and Francisco Pietri, Rafael Gomez Diaz, José Gregory y Ramos, Francisco Lluch Negroni, Francisco Cedeño y Ayala, Fraticelli brothers, Vicente Limarola y Benigno, and Angel Pedro Agostini, with the costs against the plaintiff, and the cross-complaint filed by Domingo Pietri is dismissed. It is ordered that this judgment be served on the

defendants in default in accordance with the provisions of article 768 of the Law of Civil Procedure, by the insertion of notice thereof in the *Official Gazette* of the province. Thus, by this final judgment pronounced, ordered and signed. (Statement of interlineations, etc., in original Spanish.)—Eduardo Acuña.''

From this judgment an appeal was taken by counsel for the plaintiffs to the former *territorial audiencia* of this Island, and the appeal having been perfected the following judgment was rendered by said *audiencia:*

''In the city of San Juan Bautista of Porto Rico, December 27, 1897. A hearing was had of this declaratory action of greater import brought in the Court of First Instance of San Germán by Francisca Evelina Remond, in her own name and as the intestate heir of her son Juan Arturo Vergés and Maria Vergés Remond, defended in this higher court by Attorney Hilario Cuevillas Hernandez, and represented by Solicitor José Manuel Rossy y Guerra, as appellants and plaintiffs, against Domingo Pietri y Pietri, defended by Attorney José Severo Quiñones y Caro and represented by Solicitor Emigdio S. Ginorio y Alayón, his codefendants Francisco Cedeño y Ayala, Angel Pedro Agostini y Natali, Vicente Limarola y Benigni, Francisco Lluch Negroni, Francisco Pietri, José Gregory y Ramos, and Fraticelli brothers, being in default in this higher court, the default of the last three having also been· entered in the lower court, as well as Rafael Gomez Diaz, who died subsequently, as respondents and defendants, involving the recovery of lands, the annulment of proceedings to establish possession and alienations by public deeds, and cancellations in the registry of property, pending before us by virtue of an appeal taken by the plaintiffs from the judgment rendered on December 11, 1895, sustaining the exception of *sine actione agis* alleged by the defendants, rendering judgment in favor of Domingo and Francisco Pietri and the other codefendants, with the costs against the plaintiff, and dismissing the cross-complaint filed by the representative of Domingo Pietri.

''The findings of fact of the lower court are accepted. Upon judgment being rendered an appeal was taken by the plaintiffs, which was admitted, the parties being cited and summoned. The record was forwarded to this higher court, and José Manuel Rossy y Guerra was recognized as counsel for the appellant in this court and Solicitor Emigdio S. Ginorio for the respondent Domingo Pietri. After the

preparation of the abstract the record was delivered to the appellant for examination, who, upon returning it, prayed in a supplementary prayer, according to article 861, that evidence in the second instance should be heard, on the ground that it had been impossible to introduce part of that presented in the first instance, because the introduction of expert evidence having been allowed and admitted, two experts appointed and the third one in due form, letters rogatory were addressed to the Ponce court for the acceptance of one of them, which letters were returned with the statement that he refused to accept; for this reason the court called a hearing and appointed another expert in his place, who accepted, the experts stating in their report that they could not conclude the work on account of want of time, having been able to survey one of the sides of the rectangle only, this showing that the evidence could not be taken which is one of the grounds set forth in subdivision 2 of article 861 of the Law of Civil Procedure for hearing evidence in the second instance.

"The record having been referred to the respondent he returned it, opposing the taking of evidence on the ground that the appellant had proposed that evidence in the first instance and that it had not been possible to take it owing to the fact that instead of exercising due diligence and activity in submitting it, he permitted time to elapse in presenting the letters rogatory to notify the expert appointed who refused to accept it, holding the letters rogatory relating to such refusal to accept in his possession from August 18th to September 3rd, when he presented them; and, instead of taking the proper steps, he accepted the order of the 11th fixing the 15th of September as the date the experts were to begin their work, and the experts appeared and submitted their report on the 18th, without requesting an extension of time, and for these reasons he opposes the hearing of evidence.

"The introduction of evidence in the second instance was denied on account of the fact that causes which prevented the taking thereof beyond the control of the party not having been established, but the record shows the contrary, in view of the fact that the letters rogatory returned by the Ponce court on September 7th and acted on on that and the following day, when they were delivered to him, were not presented in San Germán until the 7th, on which day, upon his petition, a call for the appointment of a new expert for the 11th was issued, when one was designated who accepted, in place of the expert who refused the appointment, and on said 11th, the 15th was fixed for the work of the experts, who were to appear and make their report on the 18th; these orders, which were accepted, showing that

if such evidence was not introduced it was due to the party not having exercised the proper diligence nor made the proper petitions, because not even an extension of time was requested.

"A recommendation of the order of the court above referred to of August 22, 1896, having been prayed for and it having been denied on the same grounds, and an appeal from this ruling having been taken and perfected, a day was set for the hearing, with the attendance of the solicitors and counsel for the parties who had entered an appearance, such hearing lasting from November 27th to the seventh instant, the rules of procedure having been observed in this second instance.

"Special Judge Juan Morera Martinez prepared the opinion of the court.

"The second, tenth, twelfth, fourteenth, fifteenth, sixteenth and seventeenth conclusions of law are accepted.

"The plaintiffs, in praying for a declaration that the estate of eight hundred odd *cuerdas,* the subject of their claim, and the plantings thereon belonged to them in full ownership, and that it should be placed at their disposition free and unencumbered, that the proceedings to establish possession instituted and approved and the sales to which the plaintiffs make reference, are null and void, and that the record of all these null acts in the registry be cancelled, in so far as they are opposed to the titles of said estate, imply that the plaintiffs brought a real action for recovery.

"In order to maintain such an action it is necessary to prove fully not only the ownership claimed, but also the identity of the thing claimed, as the Supreme Court has repeatedly held.

"According to said jurisprudence and the laws relating to the exercise of an action for recovery, the existence of a certain title to the things the subject of the recovery is necessarily required, and such title is none other than the grant made by the State to Fernando Maria Pinatell, which does not establish the ownership of the thing sought to be recovered, the essential basis of the action prosecuted.

"Although the plaintiffs are the owners of the Pinatell grant of 4 *caballerías* of land, or 800 *cuerdas,* which were surveyed before the issue of the title of protection, forming, according to said survey, a rectangle of 40 by 20 *cuerdas* in length, it is not possible to admit without proof nor justification whatsoever, the difference which the plaintiff maintains was introduced in the sale made by Juan Aubret to Pedro Mompesart, because this difference gives to the land the shape of an irregular polygon due to the variation of

adjoining estates, directions, points and boundaries; while it is noteworthy that the lands of Antonio Montes, alleged to have formerly belonged to Diego Torres, are on the south and are not situated, as in the grant, at the mouth of Almendrones Brook in the Chiquito River, which pass, according to the plan and survey made by Vergés without any legal formality whatsoever and upon which the plaintiffs base their action, is at a great distance from said point and lands.

"The entrance to Almendrones Brook being one of the points or vertexes of the rectangle constituting the Pinatell grant, according to the title of protection, this important point should serve as the basis for every measurement and survey, if the other points have disappeared, as alleged.

"The Pinatell grant, fixing as it does the four cardinal points of the survey, it appears natural that the Aceitunas and Carrizales ridges would have been mentioned, had they constituted the limits or boundaries, for which reason the plans and measurements made by the inspector of forests, especially that made with the assistance of the expert and attorney-in-fact of the Estate of Vergés, must be considered as being those which fix and determine the site and boundaries of said Pinatell grant.

"According to these plans and measurements and the other evidence introduced, the lands claimed of the defendants are situated to the north of the Pinatell grant and, therefore, outside of it.

"For these reasons the claims of Pedro Lázaro Vergés and his estate could not be successful, nor could the execution of the decree-judgment of the Council of State in the suit against the Administration relating to the reversion to the State of the lands granted to Pinatell be effected, such claims being rejected because different lands were claimed and because the question of identity was not settled by the documents and plans presented, above which stood the title of the original grant in which the four points of the survey and the boundaries thereof are set forth.

"The other documents and evidence introduced by the plaintiff do not produce the proof necessary in law nor a reasonable conviction for the identity of the lands sought to be recovered.

"Instead of being convinced of such identity, there arises a reasonable conviction to the contrary, because the lands claimed are to the north of the Pinatell grant and outside of it, and because among the lands claimed is an estate for which an action has been brought against Pietri, as situated in the *barrio* of Rubias, which he has

owned and the ownership of which he has had recorded in the registry, of 50 *cuerdas,* situated in the *barrio* of Rio Prieto Poniente, and against Angel Agostini for lands outside of the grant which has been sold to him by Vicente Limarola and to the latter by Fraticelli brothers, both of them defendants also, and whose lands originated in the grant made to Francisco Diaz Resino by the state in 1849

"The exception of prescription was alleged by the defendants to be considered in the event of the exception of *sine actione agis* being overruled, and as the latter is sustained it is not necessary to discuss such prescription and the evidence in support thereof introduced in the case.

"The boundaries fixed in the deed attached to the complaint, changing those contained in the Pinatell grant and those fixed by the unsupported statement of the person charged with the presentation of the titles in the registry of property, without any note whatsoever being confirmed by the owners of the property said to adjoin, cannot for this reason prejudice such owners, as they are third persons.

"In affirming the judgment the costs should be taxed against the appellant.

"In view of the decisions of the Supreme Court of September 27, 1865; May 18, 1866; April 5, 1867; May 22, 1880; and May 26, 1886; articles 348, 349, 430, 438, and 445 of the Civil Code; the Royal Order of October 7, 1867, for the application of the Mortgage Law, and articles 596, 601, 631, and 658 of the Law of Civil Procedure, we adjudge, that we should affirm and we do affirm the judgment appealed from, with the costs against the appellants, and it is ordered that the secretary comply with the provisions of article 283 of the Law of Civil Procedure. By this, our judgment, do we pronounce, order and sign.—Tomás Valls, Federico Serantes, Antonio Martinez, Miguel Monreal, Juan Morera Martinez.''

From the foregoing judgments it may be seen that the main question at issue in this cause is whether the appellants have proved their right to the land the title to which was based on the grant made to Pinatell by the Government, in the year 1834. While the record is very voluminous the question to be decided is comparatively simple.

Have the appellants proved that the lands claimed by them under the grant to Pinatell are now illegally retained

by the defendants? Is there anything in the record tending
to show that the lands comprised in said grant are the same
as those now possessed by the defendants? Was there any,
reason whatsoever for the change of boundaries made in the
deed executed by Aubret in favor of Mompesart?

We believe that all these questions have been answered
by the judgment of the *territorial audiencia*. The appellants
show great confidence in the various decisions of the Coun-
cil of State and the result of the contentious-administrative
proceedings. We believe that none of these decisions or
proceedings are binding upon the defendants, who were not
parties thereto. The plaintiffs should have shown that the
lands described in the grant to Pinatell, with the bound-
aries therein set forth, are the lands possessed by the de-
fendants, or should have established the cause and justifi-
cation for the change of said boundaries. They have failed
to adduce the slightest legal ground for this change in the
area and situation of the land. It has not been shown that
the Estate of Vergés nor any of its predecessors in title have
exercised any continuous acts of possession over the land
transformed. The mystery will always exist of how what
was originally a rectangle could have become converted into
an irregular polygon.

There is a slight indication in the record that Aubret con-
structed a house on one part of the land; but it appears that
another person tore it down. With regard to the physical
acts of possession on the part of the defendants, shown in
the record, this evidence has been taken from proceedings
in which the defendants had no intervention. We have care-
fully examined the record to find something which would
give us a reasonable explanation of the change made in the
deed executed by Aubret in favor of Mompesart.

There are two ways of looking at this omission of iden-
tification. One is that the appellants have failed to identify
the lands they claim under the grant made to Pinatell; and

the other, that they have failed to prove that the lands possessed by the defendants are identical with those claimed by the appellants  All the indications of the record point to the lands of the defendants being situated outside of said grant.

The question is essentially one of fact.  This question was studied most carefully by the judge of first instance. The *territorial audiencia* studied it no less minutely.  We have also examined the record and find no ground upon which to reverse the findings of fact of the lower courts.  And if we entertained any doubt upon this point we would have to adopt as a guide the Decisions of the Supreme Court of the United States, which hold that in cases in which the lower courts agree as to the facts definitely established by the evidence, said court must accept the opinion of the lower courts, unless the latter should have clearly committed an error in weighing the evidence. (*Stuart* v. *Hayden*, 169 U. S., pp. 1 and 14, and the cases cited on page 14.)

We accept the findings of fact and conclusions of law of the *territorial audiencia* and affirm in all its parts the judgment rendered by said court.

*Affirmed.*

Justices Hernández, Figueras and MacLeary concurred.

Mr. Chief Justice Quiñones did not sit at the hearing of this case.